[No. B041110. Second Dist., Div. Seven. Nov. 16, 1992.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT ANTHONY VON VILLAS et al., Defendants and Appellants.

**COUNSEL**

Russell Iungerich and Mark D. Greenberg, under appointments by the Court of Appeal, for Defendants and Appellants.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Acting Assistant Attorney General, Marc E. Turchin and Paul C. Ament, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

FLYNN, J.*—

I

PROCEDURAL BACKGROUND

Because of the unique procedural history of this case, it is appropriate to set forth at length the various twists and turns it followed. Janie Ogilvie, Robert Anthony Von Villas and Richard Herman Ford were named defendants in an indictment returned by the Los Angeles County Grand Jury on February 15, 1984. Each defendant was charged with conspiracy to commit murder (Pen. Code, § 182; all statutory references are to the Penal Code unless otherwise indicated) and murder (§ 187). Thomas Weed was the victim. The special circumstance of murder for financial gain (§ 190.2, subd. (a)(1)) was alleged.

Ms. Ogilvie, Von Villas and Ford requested a postindictment preliminary hearing on March 16, 1984, and on March 22, 1985, the preliminary hearing resulted in an information being filed against Von Villas and Ford as defendants. Ms. Ogilvie became a nondefendant coconspirator, and Joyce Reynolds and Julie Rabold were also named as nondefendant coconspirators.

On May 14, 1985, Von Villas and Ford challenged the information through a section 995 motion. Concomitantly, the prosecution filed a motion to consolidate the case with another prosecution pending against the defendants involving the attempted murder of Joan Loguercio, inter alia.[1]

On July 15, 1985, the section 995 motion was conditionally granted in part by Judge Altman. On July 17, 1985, Judge Altman was the subject of a

---

*Judge of the Los Angeles Superior Court sitting under assignment by the Chairperson of the Judicial Council.

[1]*People* v. *Von Villas*, Los Angeles Superior Court No. A392422, this court's number B033751, is the subject of a separate opinion of this court.† It involved charges of conspiracy to murder and two attempts to murder Joan Loguercio, and several robbery and related charges. The two cases were tried separately. This case will hereinafter be referred to as the Weed case, while the other will be referred to as the Loguercio case.

†Reporter's Note: *People* v. *Von Villas* (1992) 10 Cal.App.4th 201 [13 Cal.Rptr.2d 62].

peremptory challenge pursuant to section 170.6 of the Code of Civil Procedure by the prosecution. On July 25, 1985, the case was assigned to Judge Williams.

On August 26, 1985, the prosecution's motion to consolidate the Loguercio and Weed cases was granted, and on August 27, 1985, Judge Williams modified Judge Altman's conditional ruling on the section 995 motion, allowing 25 overt acts to be charged in the conspiracy count of the Weed case as opposed to the one overt act allowed to be charged in that count by Judge Altman.

On October 14, 1986, the prosecution filed an amended information, consolidating the Loguercio and Weed cases.

During the 11-month period between Judge William's ruling on the section 995 motion and motion to consolidate and the filing of the amended information, extensive pretrial motions were heard.

On March 10, 1987, Judge Williams granted Von Villas and Ford's motion to transfer the Weed case to the Northwest District because of constitutional venue considerations. That ruling was stayed until the completion of the trial of the Loguercio case before Judge Williams, which trial was concluded on January 7, 1988.

The Weed case was then transferred to the Northwest District on January 21, 1988, where it was assigned to Judge Schempp for all purposes on January 27, 1988.

Ford filed a motion for separate trials before Judge Schempp on April 5, 1988, which was denied. He was, however, granted the right to be tried by a separate jury from that which would hear the Von Villas evidence.

The trial of Von Villas and Ford commenced on July 5, 1988, both juries hearing evidence at times together, and at other times out of the presence of one another.

The Ford jury returned verdicts of guilty as to all charges and found the special circumstance allegation to be true on October 11, 1988. At the time of delivery of the Ford verdict, the Von Villas jury was in the midst of the defense case.

The Von Villas jury returned verdicts of guilty as to all charges and found the special circumstance allegation to be true on November 3, 1988.

Ford's penalty phase trial commenced on November 7, 1988, and was submitted to the jury on November 22, 1988. Von Villas's penalty phase trial commenced on November 28, 1988, and was submitted to the jury on December 13, 1988.

On November 29, 1988, the Ford penalty phase jury announced that it was deadlocked and it was discharged. The prosecution elected not to proceed with a new penalty phase against Ford, the jury having voted 11-1 in favor of life without the possibility of parole.

On December 15, 1988, the Von Villas penalty phase jury fixed his punishment as life without the possibility of parole.

On February 23, 1989, Ford was sentenced to a term of life without possibility of parole on the murder with special circumstance count, and 25 years to life on the conspiracy count. The sentence on the conspiracy count was stayed pursuant to section 654, and the life without possibility of parole sentence was ordered to run consecutive to the 36 years to life sentence imposed upon him in the Loguercio case.

Von Villas was sentenced on March 8, 1988, to the same sentences that were imposed upon Ford. The life without possibility of parole sentence was ordered to run consecutive to the 35 years to life sentence imposed upon Von Villas in the Loguercio case.

Von Villas and Ford appeal from their convictions below.

## II

### FACTS

#### A. *The Disappearance of Thomas Weed*

Mr. Weed was employed by Medical Coordinating Associates for the purpose of preparing advertising. On Wednesday, February 23, 1983, he brought some artwork into the office that had to be taken to the printers for a Thursday deadline. Mrs. Marilyn Baron, an employee of that office, saw him on the 23d, but never saw him thereafter and never was able to contact him again. Mr. Weed had never caused problems before and was not owed money by the company. Mrs. Baron's daughter, Helen Epler, also last saw Mr. Weed on February 23. After unsuccessful attempts to reach him on Thursday and Friday of that week, she called the police about his disappearance on Friday, February 25, 1983.

Mr. Weed did appear at Grand Prix Auto Body, Inc., at approximately 4:30 p.m. on February 23, in order to sign a power of attorney for an insurance draft. Warden Black, the operator of that business, recalled seeing him. Ms. Ogilvie, Mr. Weed's estranged spouse, came in to sign the joint draft sometime after Mr. Weed left the premises. Mr. Weed spent about 30 minutes at the shop and was agitated and upset. He talked about his divorce from Ms. Ogilvie. Mr. Black recalled that both parties were required to sign the draft before he could release the car, which belonged to Ms. Ogilvie's son, and which had been repaired.

Christina Brockstedt, the apartment manager for Mr. Weed's apartment complex, entered his apartment sometime toward the end of February 1983 at the request of Ruth Caplan, Mr. Weed's sister. She entered with a neighbor and found the apartment very hot, since the heat had been left on. Mr. Weed was nowhere to be found. His clothes were neatly stored along with two empty suitcases, and appropriate toiletry articles. There was stale bread and melted butter on the table, and, to Ms. Brockstedt, it looked as though Mr. Weed had stepped out and would be returning. Mr. Weed had been late with his rent but once—in March 1982.

On March 4, 1983, Officer Jack Dillard of the Los Angeles Police Department (LAPD) assigned to Devonshire Division, entered Mr. Weed's apartment with the manager. He was responding to a station call reporting Mr. Weed as missing. He made observations identical to those made by Ms. Brockstedt.

John Sharp, a good friend of Mr. Weed's, lived in a suburb of Toronto, Canada, and kept in contact telephonically with Mr. Weed and his then wife on a regular basis since 1977, the year the Weeds moved to California. Mr. and Mrs. Weed had been divorced after their arrival in California. Mr. Sharp and Mr. Weed would talk to each other on special occasions, such as birthdays. He spoke to Mr. Weed sometime between February 18 and 20, 1983, in order to wish him a happy birthday. Weed's birthday was on February 28. Mr. Sharp regularly received birthday greetings from Mr. Weed, but never received another call from Mr. Weed after the February 1983, talk.

Ruth Caplan, Mr. Weed's sister, lived in Canada but was very close to Mr. Weed even after he moved to California. After Mr. Weed's divorce from Betty Weed, Mrs. Caplan and her husband joined Mr. Weed and his new wife, Janie Ogilvie, in Las Vegas on the weekend of the Weed-Ogilvie marriage on November 7, 1981. The Caplans also visited Mr. Weed and Ms. Ogilvie for two weeks during the 1981 Christmas holidays, and Mrs. Caplan

sensed tension between the newlyweds. Ms. Ogilvie was heard to say that she did not need men now that she was established and that she could do things by herself. Ms. Ogilvie spoke with Mrs. Caplan after the Caplans returned to Canada. She said "If I could just get him out of my life. I could have him run down. There's people that will do this down here for $500." Mrs. Caplan told her that she was talking foolishly. On March 21, 1982, Ms. Ogilvie wrote Mrs. Caplan indicating that she, Ms. Ogilvie, was obsessed with Mrs. Caplan and that she felt that Mrs. Caplan and Mr. Weed were ganging up on her and cheating her.

Mrs. Caplan called Ms. Ogilvie in 1983 to find her brother, and Ms. Ogilvie hung up on her.

On February 20, 1983, Mrs. Caplan had her final conversation with Mr. Weed when he called her at her Florida vacation home. They discussed his desire that the Caplans move to California and join him in starting up an allergy science business similar to the one he and Ms. Ogilvie were conducting. He said he would call on Thursday night, but never did. Mrs. Caplan sent Mr. Weed $1,000 after the call.

After Mr. Weed failed to call her, Mrs. Caplan called Don Slayton (Mr. Weed's lawyer) and "Tina" (Christina Brockstedt, his apartment complex manager). She returned to Canada and called Ms. Ogilvie, who, in response to questions about Mr. Weed's whereabouts, stated that Mr. Weed was with Mrs. Caplan. This call occurred in March 1983.

After not having heard from Mr. Weed for three or four weeks, Mrs. Caplan placed an ad in the Los Angeles Times, receiving no response. She then traveled to Los Angeles, where Mr. Slayton picked her up at the airport. They proceeded to Mr. Weed's apartment where she stayed for about four days. A review of his mail indicated that the birthday cards sent to Mr. Weed by both Mrs. Caplan and his ex-wife, Betty Weed, were unopened. She also found a piece of paper in the apartment that contained the words "Jan threatened to kill me today" written in Mr. Weed's hand.

Mrs. Caplan recalled that during her last few conversations with her brother that he was aware that Ms. Ogilvie wanted to dissolve the business partnership with him and that he was threatened and frightened by her.

Mrs. Caplan also wrote a letter to LAPD wherein she quoted Ms. Ogilvie as saying that it is easy to get rid of men as partners. "It's easy to scatter their bones and I'm just a gal . . . that could do it." She further testified that within 45 days of the Weed/Ogilvie marriage Ms. Ogilvie stated that she

knew how to commit the perfect crime because "[d]own here you have to have a body. They can't prove anything without a body . . . in order to commit the perfect crime what you have to do is get rid of the body. You just scatter the bones."

Mrs. Caplan recalled that Mr. Weed told her that Ms. Ogilvie's first husband, Richard Shepard, told him "you should run for your life and get away from her. She has given me 20 years of hell."

An employee of World Savings' Northridge Branch, the branch at which Mr. Weed had a checking account, indicated that a $1,000 deposit was made with a check containing the names Thomas Weed and Ruth Caplan on February 17, and a small deposit was made on February 22, 1983. No further activity on the checking account subsequent to that time was noted.

Mr. Weed's safe deposit box at Security Pacific Bank's Tarzana office was last accessed by Mr. Weed on February 22, 1983, at 11:30 a.m.

Chuck Alessio, operator of Et Cetera Graphic, had received a "rush" order from Mr. Weed on February 20, 1983, to be picked up the next day. Mr. Weed came in and checked the order and indicated that additional work was needed. The job was ready on February 23, because Mr. Weed needed it in a hurry. Mr. Weed never appeared to pick up the work and was never seen by Mr. Alessio again.

Reg Fudge, Jr., general manager of KMI Leasing, entered into a 36-month lease with Mr. Weed of a 1981 Toyota Starlet. Mr. Weed consistently made payments. The payment due on February 1, 1983, was received on January 31, 1983, and no additional payments were made. The last payment on the lease was to have been due on September 1, 1984. The car was returned to KMI on April 2, 1983, coated with fingerprint dust inside and out.

Don Slayton, Mr. Weed's attorney, was retained by him in October 1982, to handle litigation matters with Ms. Ogilvie, including dissolution of both the business partnership and the marriage, among other things. Mr. Slayton considered the Weed/Ogilvie relationship a volatile one. He last saw Mr. Weed on February 22, 1983. Mr. Weed never indicated to Mr. Slayton that he planned to leave. To the contrary, Mr. Weed had expressed an interest in starting a business similar to the laboratory business he and Ms. Ogilvie were running. During some telephone conversations Mr. Weed expressed fear that Ms. Ogilvie might put him away if he did not settle the case. A few weeks before his disappearance he told Mr. Slayton that Ms. Ogilvie had friends and that if the body was not found she could never be arrested for

any charge of murder. He stated at one point "Maybe I should just take whatever she offers because I'm afraid she will carry it out." On March 12, 1983, Mr. Slayton filed a missing person's report with LAPD.

B. *Law Enforcement Efforts to Find Mr. Weed*

LAPD Officer James Lewis was assigned to investigate the missing person report filed by Mr. Slayton on March 12, 1983. He conducted interviews, checked the coroner's office, checked to determine whether Mr. Weed had been the victim of crime or a traffic accident, and visited Mr. Weed's apartment. A discussion between Officer Lewis and Ms. Ogilvie revealed that she recalled two men from Las Vegas visiting her on New Year's Day who, she felt, were looking for Mr. Weed so they could collect a gambling debt. She told Officer Lewis that Mr. Weed had a gambling problem and she remembered giving the two visitors his home address.

Other LAPD officers were assigned to search for Mr. Weed. His dental records were sent to the Los Angeles County Coroner's office and eventually to the Department of Justice in Sacramento for analysis.

On March 23, 1983, Mr. Weed's Toyota was found at the Los Angeles International Airport. The car was dusty and revealed no signs of violence inside. There were three different brands of cigarettes in the ash tray which were tested scientifically for saliva and blood type analysis. The results of the tests were inconclusive. A map of Wyoming was found in the car. On it was an unknown fingerprint. No other prints were found inside or outside the car, yet the car did not appear to have been wiped clean for the purposes of destroying prints. The car had been parked at the airport either on February 23 or 24, 1983.

Other officers sent Mr. Weed's fingerprints to the Department of Justice in Sacramento, sent identifying information on Mr. Weed to the Federal Bureau of Investigation and to officials in 49 states. Interpol was contacted, as were Mexican and Canadian officials. The Immigration and Naturalization Service was notified of Mr. Weed's disappearance. Other investigation included police contacts with airlines, car rental agencies, hospitals, shipping lines, railroads, travel agents, and other governmental agencies. Mr. Weed was nowhere to be found.

Admittedly there were some flaws in the search process. Mr. Weed had certain aliases, one of which, Michael White, he had registered with the Department of Consumer Affairs in his capacity as a debt collector. That name was forwarded to the authorities, but other names which Mr. Weed used (Teleford, Hart and Stevens) were not forwarded to all of them.

Upon receiving word that certain Shell Oil Company credit card invoices dated April through May of 1983 had surfaced on Mr. Weed's account, Officer Henry Petroski, LAPD, investigated the matter and determined that the invoices were not signed by Mr. Weed.

Ms. Ogilvie's son, Thurston J. Shepard (T.J.), had indicated at one point that he had seen Mr. Weed some seven to nine days after he had picked up his car at Grand Prix Auto on February 23, 1983. He later corrected that date to reflect that he was wrong, but admitted that he was confused as to when he had last seen Mr. Weed.

### C. *The Plan to Kill Mr. Weed*

Ms. Ogilvie and Mr. Weed had started a business called Ford-Kennedy Medical Lab before their marriage. It was a successful venture which specialized in food allergy testing. Ms. Ogilvie operated the business, but Mr. Weed worked as an administrator, principally handling payroll issues.

Once their relationship was confirmed by marriage, they began experiencing severe problems, and were separated in January of 1982. Although Mr. Weed continued to work at the lab, they had both verbal and physical altercations at the workplace, principally revolving about the division of the lab proceeds. Ms. Ogilvie allegedly was beaten by Mr. Weed. In August of 1982 Ms. Ogilvie asked Mr. Weed to leave the business, both orally and in writing, claiming that he was stealing from her.

Their feuds became so violent that they both filed charges against one another with LAPD.

Julie Rabold Kanoske became an employee of the lab during the summer of 1982, and became a close friend of Ms. Ogilvie even though she was only 20 at the time. Julie's mother, Joyce Reynolds, also became a friend of Ms. Ogilvie, and visited the lab fairly often.

After the divorce proceedings commenced in the fall of 1982, Ms. Ogilvie was quite open in discussing her marital problems with members of her staff. Julie Rabold Kanoske suggested on several occasions that Ms. Ogilvie hire a hit man and have Mr. Weed killed. She told Ms. Ogilvie that she had friends in LAPD's Devonshire Division, among others, who could take care of the problem. Although she did not take Julie seriously at first, later on Ms. Ogilvie did.

Ms. Ogilvie, Julie Rabold Kanoske, Patricia Smart, Elzo Perkins and Diane Shamis Perkins went to lunch in Northridge in December, 1982. Ms.

Ogilvie stated she was "just fed up" to which comment Julie responded, "well, you ought to just get a hit man and have him taken care of." Julie said she knew people who could make someone disappear. Ms. Ogilvie stated that they should discontinue the discussion.

Von Villas called Ms. Ogilvie at the lab in December, 1982, and stated that he was a friend of Joyce and Julie's. She spoke with him for about five or six minutes concerning her plans for opening a lab in San Diego and his interest in investing in it.

In January 1983, Joyce Reynolds once again suggested to Ms. Ogilvie, while they were both at the lab, that she should hire someone to get rid of Mr. Weed. Joyce had friends who could help. Later that month Ms. Ogilvie had lunch with Ms. Reynolds at a Howard Johnson restaurant. Again, Ms. Reynolds repeated the suggestion, mentioned she had friends who could help, and, in fact, mentioned the name "Bob."

On New Year's Day of 1983 Ms. Ogilvie recalled two men she thought were from Las Vegas visiting her home about 8 a.m. looking for Mr. Weed. She knew Mr. Weed had a gambling problem, and assumed that they wanted to complete a collection procedure. After giving them Mr. Weed's address and telephone number, she called Weed and advised him of the visit. He said he knew who the men were and did not seem upset.

The Las Vegas collectors, identified as "Vic" and "Charlie," had at least three more encounters with Ms. Ogilvie during January 1983. During one meeting, they cut her off the road while she was driving demanding $5,000 to pay Mr. Weed's debt. She eventually gave the men $2,800 and never saw them again, although she later denied that she made such a payment. She did not tell the police about the encounter with "Vic" and "Charlie" in her August 1983, interview, nor could she recall what they looked like.

A few days after a divorce court hearing which occurred on or about January 11 and 12, 1983, "Vic" and "Charlie," two police officers assigned to Devonshire Division, came to her home to discuss her problem with Mr. Weed. Vic was later identified as Von Villas and Charlie as Ford. Vic stated, "We have a mutual friend, Joyce and Julie." He further told her that he could help her with her problem by taking care of the guy. When she asked what he meant by that, Von Villas said that he could be hurt real bad or just disappear. The price mentioned was anywhere from $7,500 to $30,000. Ms. Ogilvie remembered that Von Villas was wearing a wig which was brown with some gray in it. He had a moustache. He appeared to be wearing makeup. Ford looked like his hair did not quite fit, although she could not

tell whether he was wearing a wig. Ford's face was darker than when she saw him in court, and he did not say much during the 20- to 30-minute meeting. Ms. Ogilvie said she would have to think about the plan. Von Villas told her to let Joyce know if she wanted to take advantage of the offer. The following day Ms. Ogilvie told several members of her staff about the meeting, including Diane Shamis Perkins, Elzo Perkins and Patricia Smart.

With respect to the wigs and makeup, Darlis Chefalo, a professional makeup artist who specialized in wigs and toupees, recalled being introduced to Von Villas and Ford upon their being referred to her by Jack Stone. Either Von Villas or Ford explained to her that they were federal narcotics officers working undercover, and wished to acquire makeup and wigs that would alter their appearance for their work. Ms. Chefalo provided wigs and makeup and instructed them on how to use them. After the last of three meetings with them, Ford, upon leaving, told her not to keep a copy of the receipt and that she should forget that she had ever seen them. Ms. Chefalo had given them a bag of makeup and sponges for application at that meeting.

Near the end of January Ms. Ogilvie met with Joyce Reynolds about 9:30 p.m. at Darby's restaurant and told her that she wanted Joyce's friends to take care of Mr. Weed. Joyce said she would make the appropriate contacts. Either later that night or on the following night, Joyce called Ms. Ogilvie and stated, "Bob is going to be calling you. He wants to be known as Mr. Ory."

The night after Joyce's call, Ms. Ogilvie received a call from a person who identified himself as Mr. Ory, but whose voice she did not recognize. He stated that he understood from Joyce that she, Ms. Ogilvie, wanted to proceed with the plan, and advised that he would need a photo of Mr. Weed, identifying information concerning his car and other items of identification. Mr. Ory said he would call for the information in a couple of days, and when he did, Ms. Ogilvie provided the identifying information. Mr. Ory said he would get back to her with a price once he determined how difficult the job would be. A few days later, Mr. Ory called back and said the price would be $20,000, which was the same amount Ms. Ogilvie had told Joyce that she could afford during the Darby's restaurant meeting. A plan for making the payment in two or three installments was discussed. Mr. Ory said he would be working with guys from out of town and that "Dickie" would call her. Ms. Ogilvie never received such a call.

During her conversations with Mr. Ory she heard background noises which sounded like motors revving in a garage. Once Mr. Ory excused himself while talking on the telephone and was heard to call out "Dickie."

Mr. Ory instructed Ms. Ogilvie to make the first payment of $7,500 in $50 or $100 bills. The bills were to be placed in an envelope and put in a car with windows slightly open parked in a service station at the corner of Roscoe and Reseda Boulevards. The money was delivered by her by pushing the envelope into the slightly open window of a Chevy or Pontiac Burgundy-colored car, which she later identified.

After making the payment, Mr. Ory called her and advised that he had the money and would make arrangements for the second payment. He also, when asked by Ms. Ogilvie as to how Mr. Weed was to be taken care of, stated, "Well, they are just never going to find him . . . let's just say there is a lot of desert between here and Las Vegas."

The second payment drop was to be in the amount of $5,000. Mr. Ory called Ms. Ogilvie some five or six days after the first drop to discuss the second drop, but did not provide specifics as to time and place. A few days after this call, Mr. Ory called her again (mid-February) and told her to go to an address on Reseda Boulevard about 9 p.m. and look for a parked white van near the 6000 block. The modus operandi for the second drop was identical to that of the first, the money to be pushed through the slightly cracked driver side window. Instead of delivering the second payment personally, Ms. Ogilvie arranged for her divorce attorney and intimate confidant Ron Brot to make the drop. Ms. Ogilvie delivered the money to Mr. Brot at Charley Brown's in Marina Del Rey together with a slip of paper with the address.

Mr. Ory contacted Ms. Ogilvie later on the night of the second drop and indicated that he had not received the money. When she explained that another person had made the drop, he became upset. Ms. Ogilvie eventually was successful in her efforts to contact Mr. Brot, but, unable to recover the funds, put together another $5,000 package and made the second drop personally at the same address but into a different car. Mr. Ory called Ms. Ogilvie on February 20 or 21, to report that he had received the second drop funds, and that he would call her once everything was taken care of.

On February 23, 1983, Ms. Ogilvie saw Mr. Weed at a city attorney hearing concerning one of their altercations. She became very angry at this hearing, and when she received a call from Mr. Ory that evening, she screamed, "Do it, do it!"

Ms. Ogilvie talked to Mr. Weed on the afternoon of February 23, before she conversed with Mr. Ory about completing the planned killing. The last discussion she had with Mr. Weed concerned the insurance draft that had to

be signed by both her and Mr. Weed at Grand Prix Auto Body, Inc. on that day.

On February 25, 1983, Mr. Ory called her and stated, "You owe me $7,500." After giving her particulars about the third and final drop, Mr. Ory told her to put the money in a white van parked near Oxnard and Reseda. He also told her not to let anything happen to the drop, as he knew where her son went to school and how he got there.

Before her arrest in February 1984, Ms. Ogilvie had several contacts with LAPD officers. After trying to avoid Officer Lewis for some time, she met with LAPD Internal Affairs Division officers in August 1983, and told them several lies in an effort to avoid their becoming suspicious about her involvement in Mr. Weed's disappearance. She also forged Mr. Weed's signature on a letter dated November 26, 1983, in an effort to make it appear that he was still alive. In January 1984, Ms. Ogilvie sent Detective Gailey, LAPD Robbery Homicide Division, a four-page typewritten anonymous letter dated January 9, 1984, falsely implicating Diane Shamis Perkins and her husband Elzo Perkins in Mr. Weed's disappearance. She had been experiencing business disputes with them, and used them to seek to shift the focus of the Weed disappearance investigation to them and away from her. She alleged in the letter that Mr. Weed was involved in drugs with them.

Ms. Ogilvie went so far as to contact the Nick Harris Detective Agency by telephone, inquiring as to the cost for conducting a search for someone out of the country. This also was a smoke screen used by her to mislead the investigation.

Although Ms. Ogilvie acknowledged that Mr. Weed was capable of disappearing for periods of time on his own, she did not think that he disappeared because she paid to have him killed.

Ron Brot came into Ms. Ogilvie's life in October or November of 1982 as her divorce lawyer. She spoke with him in January 1983, about the proposal made by her friend Julie to eliminate Mr. Weed, and he said that sort of thing was done all the time. He, in fact, knew a "Mr. No Neck" who might be able to help her.

Ms. Ogilvie spoke with Mr. Brot about "hit men" on at least two occasions, but never paid him money to kill Mr. Weed. She did pay him approximately $32,000 for professional legal services rendered, which she felt was excessive. Twenty-two thousand dollars of that amount went to Mr. Brot, as did the $5,000 first payment to Mr. Ory plus an additional $4,000 to

$5,000 in March of 1983. The $5,000 first payment for Mr. Ory was, according to Ms. Ogilvie, used by Mr. Brot to buy cocaine. The March 1983, payment was for legal services. She paid Mr. Brot upon his request, never asking for a breakdown as to time spent by him on certain matters or for a bill of any kind. Mr. Brot handled only two legal hearings for her, one of which she believed was covered by her initial retainer of $10,000.

Her telephone records revealed two short calls early on the morning of the day she decided to have Mr. Weed killed from her telephone to Mr. Brot's residence, and an 85-minute call at 7:04 p.m. of the same day of like nature. Ms. Ogilvie could not recall the nature of the calls. She called Mr. Brot on February 23, at 11:25 a.m. and spoke for 77 minutes. Several other lengthy calls ensued between her and Mr. Brot. She could not recall the subject matter of the discussions.

Julie Rabold Kanoske, Joyce Reynolds' daughter, was granted immunity as a part of a plea bargain involving her mother. She had known Von Villas for 13 years, but did not know Ford. Her first contact with Von Villas was in a police community service program, and she felt as though Von Villas was a father figure to her.

She started work at the lab in the summer of 1982 and grew to hate Mr. Weed because he was a rude, mean, and verbally abusive boss. He also drank a lot and abused Ms. Ogilvie. Ms. Kanoske told her mother and Von Villas about her feelings toward Mr. Weed. She recalled suggesting to Ms. Ogilvie that she hire a hit man while at "Wolfy's" restaurant sometime in December. At that time she did not think Ms. Ogilvie was taking her seriously. She also suggested hiring a hit man to kill Mr. Weed after she left the employ of the lab in December 1982, and during the Ogilvie/Wood divorce proceeding. She admitted to having lied about her testimony before the grand jury in order to protect herself and her mother.

Joyce Reynolds, Julie's mother, had known Von Villas for 13 years. She met him at the inception of her daughter's police community service work. Ms. Reynolds and Von Villas were like brother and sister.

In December 1982, she attended a Christmas party where she encountered Von Villas. At the party he told her that he was tired of being an honest cop. He asked her to keep him in mind if she heard of any jobs that people wanted done, such as prostitution or murder for hire. He said nothing was too big or too small, and that he would do anything for money.

Having heard complaints about Mr. Weed from her daughter and Ms. Ogilvie, Ms. Reynolds recalled telling Ms. Ogilvie to hire a hit man in

September or October 1983. She reinitiated this type of conversation three or four times on later occasions.

On February 2, 1983, at approximately 7:30 p.m. Ms. Ogilvie called Ms. Reynolds and, crying, asked her if she still had the friends. When Ms. Reynolds responded in the affirmative, they agreed to meet at Darby's that evening, which they did. While driving around in Ms. Ogilvie's car, Ms. Ogilvie said she wanted Mr. Weed killed. Ms. Reynolds said she had someone who would help and mentioned the name Bob Von Villas. Ms. Ogilvie said she had $20,000 for the job, and Ms. Reynolds said she would call her back.

Ms. Reynolds called Von Villas from her home and told him Ms. Ogilvie wanted Mr. Weed killed. He said he could do the job and asked for a list of things she should get from Ms. Ogilvie. He then changed his mind and told Ms. Reynolds he would call Ms. Ogilvie direct, and asked for and received her telephone number. He said Ms. Reynolds should tell Ms. Ogilvie that he would call her and that his name was Mr. Ory. Ms. Reynolds made the call to Ms. Ogilvie and passed on the message.

Not having heard anything from Von Villas or Ms. Ogilvie, Ms. Reynolds called Von Villas at a garage about one month after their last conversation. When she asked him if he had been able to take care of the problem, he stated, "The only thing I can tell you is that there's lot of space between here and Las Vegas 'and that' Julie doesn't have to worry about Tom Weed anymore." He said he, Mr. Weed, was dead.

In August 1983, Von Villas called Ms. Reynolds when he was in jail and asked if she, Ms. Reynolds, would call Ms. Ogilvie and ask her to loan him $30,000. Ms. Reynolds did not make the call.

Ms. Ogilvie was originally charged with murder and conspiracy to commit murder and faced possible sentences of life in prison without the possibility of parole or death. She entered into a plea agreement with the prosecution wherein in return for her cooperation, she pleaded guilty to second degree murder and received a sentence of 15 years to life. Ms. Reynolds was charged with conspiracy to murder Mr. Weed. She too entered into a plea agreement with the prosecution, whereby, in return for her plea of guilty to a charge of solicitation of the murder, she would receive a probationary term of five years on condition that she serve two hundred ninety-five days in jail.

Diane Shamis Perkins worked at the lab in August 1982, along with her husband, Elzo Perkins. She echoed the testimony of Julie Rabold Kanoske as

to the volatility of the Ogilvie/Wood relationship, and confirmed that Mr. Weed was somewhat of a drinker and gambler. Ms. Perkins remembered the late fall 1982 or early 1983 conversation at Wolfy's where the subject of having Mr. Weed killed came up. She also remembered that Mr. Brot called Ms. Ogilvie often at the lab and that she, Ms. Perkins, made many payments from the lab to Mr. Brot without seeing bills.

Ms. Ogilvie told Ms. Perkins in January 1983, about the New Year's Day visit of "Vic" and "Charlie" to her house to collect gambling debts from Mr. Weed. Shortly after the January 1983 court hearing with respect to the divorce, Ms. Ogilvie called her into Ms. Ogilvie's office and, with Pat Smart present, spoke about a couple of men that had been to her home. She told Ms. Perkins that if she valued her life she should never recount to anyone what she had told her. Ms. Ogilvie stated that these men were dangerous, terrible criminals; that they would kill you just as soon as breathe on you, and that she should never speak about it with anyone again. She then told Ms. Perkins that the two men were Devonshire Division policemen. One was named Bob. She stated they had offered to kill Mr. Weed for $15,000 and maim him or run him out of town or beat him for $7,500. She also stated that one of the officers let her son, T.J., spin the barrel of his gun. (Ms. Ogilvie's son denied that this occurred).

Although Ms. Ogilvie had told Ms. Perkins about "Vic" and "Charlie," the two Las Vegas debt collectors who were seeking out Mr. Weed, she never told her about their stopping her car on Roscoe Boulevard and asking for money, or that she had to borrow cash and give it to the "collectors."

Ms. Perkins's opinion of Ms. Ogilvie's reputation for truthfulness was that she was a liar.

Early in March of 1983 Ms. Ogilvie told Ms. Perkins that she, Ms. Ogilvie, was going to Marina Del Rey to meet Mr. Brot at Charley Brown's restaurant. The next day Ms. Ogilvie told Ms. Perkins that Mr. Brot had arrived very, very late and that she missed him. She asked Ms. Perkins to accompany her the next day, but Ms. Ogilvie did not show up.

Ms. Perkins and her husband, Elzo, cashed quite a few checks for Ms. Ogilvie, many of them in the amounts of $3,500 or $2,500.

Ms. Perkins was familiar with the Ogilvie/Brot relationship, having witnessed several shouting matches between them, most of which centered on Brot's cocaine problem and his taking money from Ms. Ogilvie. She knew that Mr. Brot visited the lab at least once a week and that Ms. Ogilvie met with him at his home. She knew they were having an affair.

On July 8, 1983, Sergeant Bonneau, LAPD, conducted a search pursuant to a search warrant of a Pontiac Grand Prix which was registered to Judith and Robert Von Villas. The car was parked at International Automotive in Chatsworth. From the car he seized six documents, including a savings account deposit ticket, a copy of a savings account ticket, a document with the name of Ms. Ogilvie and telephone numbers and a female's name and phone number. Expert testimony later revealed that Von Villas had written "Jan Ogilvie" and a telephone number on the document and that the words "Ros and Res" found on the deposit tickets were also written by him.

Gayl West, a mortgage broker, knew Von Villas through business dealings. Around January, or early February 1983, she met Von Villas for lunch at Marie Callender's, where they discussed business. As they were leaving, Von Villas told her that if she knew anybody who wanted a contract put out on anybody, with one phone call they would both make a commission. Von Villas was not laughing when he made the statement and Ms. West, taken aback, immediately left in her car.

Michael Ory had known Von Villas since 1961 when they were in high school. They lived together for a few months in 1964 and 1965. After Mr. Ory signed the marriage certificate of Von Villas and his wife upon their marriage, he had little or no contact with Von Villas, and definitely no contact in February 1983.

He had last seen Von Villas about 10 years before the trial.

Mr. Ory never gave Von Villas authority to use his name, had never met Ms. Ogilvie or Ms. Reynolds, and was unfamiliar with the lab. When shown the note containing the words "Call Mr. Ory. Mr. Ory close friend in jail" (seized from Mrs. Von Villas during a July 15, 1983, search of the Von Villas home), Mr. Ory stated he was not in jail in July of 1983 and had had no contact with Von Villas during that month. Expert testimony indicated that Mrs. Von Villas wrote the words on the note, referred to as the "Ory note."

Von Villas's bank statements at the Santa Anita National Bank, covering the period February 14, through March 14, 1983, reflected a deposit of 30 $100 bills on February 22, 1983; a deposit of 18 $100 bills and a $200 check on February 28, 1983; and a third deposit on that day of 20 $100 bills. There were deposits of $4,655.29 made between January 14, through February 14, 1983, and $2,862.98 made between December 14, 1982, and January 14, 1983.

As indicated, *ante*, LAPD officers conducted a search of the Von Villas residence at 6248 Goshen Avenue, Simi Valley on July 15, 1983, while Mrs.

Von Villas was present. Investigator Rendon observed papers in her possession, including the "Ory Note" and seized them. She told investigator Rendon that the papers contained notes she had taken from her husband over the telephone or while conversing in person. Some of the notes included "police might have your phone number"; "Joyce"; "Call second number Mr. Ory emergency"; "pay phone"; and "Julie."

On December 20, 1983, Detective Helvin, LAPD, conducted a search pursuant to a search warrant of the Ford residence on Horace Street, Northridge. A calendar for the year 1983 was seized, and the date February 23, was blackened out. Extensive scientific analysis was unable to disclose whether the blackened out area covered any writing or other markings.

On a July 8, 1983, search of Ford's residence pursuant to a search warrant LAPD officers found a shotgun and 32 shotgun shells. On the December 20, 1983, search they found two boxes of shotgun shells behind a movable partition in the wall.[2]

In a search of the Ford residence conducted pursuant to a search warrant on July 15, 1983, LAPD officers recovered makeup, hair piece tape and various appliances used for application of makeup.

In 1982 and 1983, Ford was a detective assigned to the burglary unit of LAPD's Devonshire Division's Detective Division. Von Villas also worked in the same detective division as well as the juvenile unit as a school car officer. They were not assigned as partners nor was either of them assigned as narcotics investigators. Officer Vernon Higbee knew that Von Villas and Ford had an automobile repair business. They never worked as undercover officers in any capacity, and never worked with federal law enforcement agencies. Von Villas conferred with Officer Higbee on December 6, 1982, regarding proposed disciplinary action, and Von Villas was suspended during January 1983, for conduct unbecoming a police officer.[3]

Von Villas was not at work as an LAPD officer on February 21, 1983, although he did work on February 22, 23, and 24. Ford did not work as an LAPD officer on February 21, 22, and 23.

On December 20, 1983, a conversation between Ford and his wife was audiotaped pursuant to a warrant in the visiting room of the Los Angeles

---

[2]This evidence was presented only to the Ford jury.

[3]This evidence concerning the Von Villas disciplinary problem with LAPD was presented only to the Von Villas jury.

County jail.[4] Because of technical difficulties, the surreptitiously taped conversation was recorded only in part. The approximately 20-minute long recording revealed the following in part:

"They're trying to see where the money went to.

"Good, good. There's no connection to me there. There is nothing there that connects me.

"There's no body.

"The only thing that worries me is the gas . . . [Ms. Ford: 'What?'] The Shell credit card. [Mrs. Ford: (Unintelligible) 'Why? That bother you?'] Yeah. I don't know if I got gas. . . . Don't remember.

"They're fishing. They got the idea, but they gotta, they don't have it, I don't think. We'll see.

"He's just gone. He's gone. They're trying to find out where he's at.

"We'll see. Game's not over yet. What worries me is the shotgun. The shells."

### D. The Attack on the Credibility of Janie Ogilvie

Lily Virgil met Ms. Ogilvie in 1979 at juvenile hall where T.J., Ms. Ogilvie's son, and Ms. Virgil's son were the subject of a hearing. After advising Ms. Virgil that she was in need of tests regarding a skin cancer problem, Ms. Ogilvie asked her if she could keep T.J. for a week so that she could receive the necessary treatments. T.J. thereafter stayed with Ms. Virgil for almost a year, Ms. Virgil receiving but $80 from Ms. Ogilvie as support for T.J. One day T.J. did not return to the Virgil residence after school and never contacted Ms. Virgil again. Ms. Ogilvie denied that she had failed to support T.J.

Ronald Franzman married Ms. Ogilvie in November 1983, after he had been advised that she was divorced from Mr. Weed. He did recall her telling him that a couple of "hood types from Las Vegas" were looking for Mr. Weed in order to collect gambling debts. When she introduced her son T.J. to him, Ms. Ogilvie represented that he was her dead sister's son. She also told him that she was a pathologist, had taught at the University of California at Los Angeles (UCLA), and worked for Los Angeles County. Although she actually did earn a Ph.D. in public administration at the University of Southern California, she represented to him that her Ph.D. was in biology.

---

[4]This evidence was presented only to the Ford jury.

Mr. Franzman believed her reputation for honesty was "not too high" and that she was "definitely" a liar. Eventually the Franzman/Ogilvie marriage was annulled.

Mr. Brot, Ms. Ogilvie's attorney and confidant, became unavailable as a witness when he invoked his Fifth Amendment privilege against self incrimination, allowing his grand jury testimony to become admissible as prior testimony. He indicated that he had represented Ms. Ogilvie prior to February 23, 1983, in connection with divorce and civil disputes, and that she had mentioned to him on several occasions the possibility that Mr. Weed could be made to disappear. Although somewhat conclusory in his testimony, Mr. Brot recalled Ms. Ogilvie telling him that credit card slips could and would be found bearing Mr. Weed's signature after his disappearance in Canada; that his car would be found in Mexico; and that a couple of men from Las Vegas had been looking for Weed in connection with gambling debts. Ms. Ogilvie never told Mr. Brot the details of how the Weed disappearance was to occur, but did state that he would go away without a trace. Money would have to be paid for the job, and Mr. Brot recalled that she once stated that $50,000 would be needed to pay people from the east. She mentioned that she knew police officials and mentioned a name that only took on meaning a fair time later from the newspapers. That name was Von Villas. Ms. Ogilvie stated that Julie Kanoske, the daughter of Joyce Reynolds, worked for her at the lab and that they knew Von Villas. Von Villas looked out for the welfare of Kanoske and Reynolds. Von Villas, according to Ms. Ogilvie, came by her house and stated "if you ever need any help with Weed, let us know." There were several telephone conversations between Ms. Ogilvie and Mr. Brot, but the subject matter usually involved complaints by her about the unfairness of his fees and other negative comments by Ms. Ogilvie about him generally.

Dr. Olga Gutierrez, a psychiatrist assigned to the Sybil Brand Institute, the jail in which Ms. Ogilvie was housed prior to trial, stated that she began treating Ms. Ogilvie on May 8, 1985, and, because she had been diagnosed as schizophrenic, residual type, was aware that she was taking Haldol and Cogentin. She opined that Ms. Ogilvie was not experiencing hallucinations or delusions at the time she treated her.

Timothy Chang, an attorney associated with Mr. Brot, did recall Mr. Brot stating to him that he, Brot, had told Ms. Ogilvie to "get rid of that guy, it doesn't cost that much" or words to that effect. Mr. Brot did have a cocaine habit in November and December, 1982, and the first two months of 1983.

Deborah Schroeder, an employee at the lab for the two-year period preceding August 1983, stated that Ms. Ogilvie had a tendency to brag or

exaggerate about things. She told Ms. Schroeder that two men in a convertible with Nevada plates had come to her house looking for Mr. Weed. Sometime in the spring or summer of 1983, after Mr. Weed's disappearance, Ms. Ogilvie told her that Mr. Weed was using her credit card.

Janie Ogilvie testified for the defense. She disputed the testimony of many of the witnesses who had testified to her reputation for being untruthful, including Ron Franzman, Richard Shepard, Lilly Virgil and others. She once again described "Vic" and "Charlie," the men who visited her house around the middle of January 1983. She also denied telling Mr. Brot that she paid $50,000 to people in the east to take care of Mr. Weed. She reiterated her testimony given as a witness for the prosecution as to Mr. Brot's involvement in trying to assist her in bringing about the disappearance of Mr. Weed.

Dr. Bassett Brown testified that he had been associated with the lab sometime in 1982 or 1983. Ms. Ogilvie had invited him to be medical director at the lab. On June 9, 1983, Dr. Brown sent a letter to Ms. Ogilvie terminating his association with the lab and warning her not to use his name in connection with it. When he became aware that he had been designated a director in the lab's corporate structure as reflected in a document dated September 20, 1983, which purportedly contained his signature, he claimed the signature was a forgery and that no one had been authorized to sign it on his behalf.

Dr. David Conney, a physician trained in psychiatry and psychopharmacology, stated that the fact that Ms. Ogilvie had ingested Mellaril, a tranquilizer, for at least three years, and that she had taken Haldol initially before the Mellaril, that the indication would be that her problem was a psychotic one rather than a mood or anxiety disorder. After examining the Los Angeles County Hospital and UCLA records concerning Ms. Ogilvie's admission to the UCLA neuropsychiatric unit in 1979, Dr. Conney opined that her symptoms (hearing voices, lapse of memory) were consistent with an illness. He also opined that since she had come into the jail hospital after her arrest and after three or four years on antipsychotic medications, she suffered a thought disorder.

Ms. Ogilvie's other ex-husband, Richard Shepard, the father of her son T.J., revealed through prior testimony that theirs had been an extremely volatile relationship. In May or June 1963, shortly after their marriage, they were separated. The separation was brought about in part, according to Mr. Shepard, because she had threatened to kill him with a gun after a dispute. She continued to issue threats to either kill him or ruin his life. He did meet with Mr. Weed at Weed's request to discuss Ms. Ogilvie. The meeting

occurred at the Airport Marriott shortly after the Weed/Ogilvie marriage. Mr. Shepard did indicate that Ms. Ogilvie had threatened to kill him, and Mr. Weed said that in November 1982, he and Ms. Ogilvie had had harsh words and that she threatened to kill him, Mr. Weed, as well. When asked his opinion about Ms. Ogilvie's truthfulness, he described her as a person who could almost look you straight in the eye and make you believe something that is not true.

### E. *Von Villas's Explanation Concerning Bank Deposits*

Mr. William Justice, a retail jeweler engaged in buying and selling precious stones, stated that on December 4, 1982, he bought three diamonds from Von Villas for $2,000. Two documents dated December 13, 1982, indicated that Von Villas had sold $4,800 worth of stones during one transaction and $3,300 on another. Mr. Justice paid Von Villas in cash, although for the third purchase (18 stones for $3,300) there was some sort of credit involved, as he had made a ring for Von Villas.

A bank officer at Sanwa Bank identified a check dated December 13, 1982, which was cashed at her bank on December 14. Von Villas cashed the check and was given 31 $100 bills and 40 $50 bills for a total of $5,100.

### F. *Ford's Wigs and Makeup*

On Thanksgiving night of 1980 Ford's wife, then a rapid transit district bus driver, was robbed, beaten and brutally raped. The assailant could not be found and Ms. Ford asked her husband to look for him. The makeup, wigs, sponges and other paraphernalia for application of disguises taken from Ford's house during the search were used by Ford to mask his identification as he sought out his wife's attacker in the streets.

### G. *The Calendar with February 23, 1983, Blackened Out*

Although it was not disputed that the calendar seized from the broom closet of the Ford residence on December 20, 1983, did reflect the obliteration of February 23 with black ink, Ford's adopted son, Richard Ford, Jr., stated that he had blocked out that date because his girlfriend had admonished him to do so. He could not remember why he did it, but the records of his high school indicated a dance was scheduled that night, and he did recall attending the dance.

III

Issues Presented

A. *Introduction*

Both Von Villas and Ford present multiple issues for review. Some relate to each appellant individually, and some to both. They will be discussed seriatim.

B. *The December 20, 1983, Taping of the Conversation Between Ford and His Wife at the Los Angeles County Jail*

1. *Factual Summary*

Ford had been arrested in July 1983, on robbery charges stemming from the Loguercio case and was in custody at the Los Angeles County jail. The disappearance of Mr. Weed was under investigation. On December 20, 1983, Ford was being held in module 7000, while Von Villas was housed in module 6000. Ford and Von Villas were not allowed to speak or meet with each other.

During July 1983, Deputy Sheriff Ed Dvorak began receiving information about Ford from a jailhouse informant named Billy Brown. Deputy Dvorak also received information from another informant, Anthony Love, regarding Von Villas. Love told Deputy Dvorak on several occasions that Von Villas had offered Love money to kill Ford. Von Villas also told Love that his wife was assisting him in finding prosecution witnesses and of his intent to have those witnesses killed. Deputy Dvorak relayed this information to LAPD Detective Gailey who was assigned to robbery-homicide and was investigating the disappearance of Mr. Weed.

Detective Gailey, armed with this and other information, obtained a search warrant on December 20, 1983. The search warrant contained provisions which permitted LAPD officers to tape the conversations of Ford and Von Villas with their respective visitors on the jail intercom telephones. The surveillance authorized by the search warrant had as its purpose the maintenance of jail security and the protection of witnesses. It was not the Los Angeles County jail policy to record conversations made during inmate visits on either a random or continuous basis.

On December 20, 1983, LAPD Detective Holder, one of Detective Gailey's associates, went to the county jail armed with the search warrant. He

was accompanied by an LAPD technical assistant who was assigned to set up the monitoring equipment and actually conduct the taping. The equipment was originally set up in module 6000 because there was insufficient space to conceal the equipment in the module 7000 visiting room. Detective Holder instructed the jail officials to first direct Mrs. Ford, upon her arrival, to module 7000. The phones in module 7000 were to be made inoperable so Mrs. Ford would then be directed to module 6000 to continue her visit with Ford.

Both modules 6000 and 7000 had virtually identical visiting areas; both areas having eight visiting stations. Visitors were separated from inmates by plexiglass and communicated with them by means of a phone. Each station was separated from the other by a partition. Approximately 15 feet from the phone stations was a control booth in which deputies were stationed in order to constantly visually monitor visits. The monitoring deputy would be situated behind a one-way mirror through which only he or she could see, although a small opening at the top allowed the visitor to observe the deputy. Additionally, visitors were required to show the deputy their guest pass and identification upon entering the visiting area.

When Mrs. Ford finally arrived to visit her husband in the module 6000 visiting room, no other visitors were present. The phones did not work because the amplifier in the control booth had been inadvertently turned off. Because the phones were useless to the Fords, they proceeded to communicate with one another by raising their voices so that they could hear one another through the plexiglass, while still keeping the receivers to their ears. Mrs. Ford was aware that a deputy was visually monitoring their visit from the control booth.

Deputy Baker was in the control booth at the time of the December 20, 1983, visit and recalled that Ford's voice was audible throughout the conversation, whereas Ms. Ford's voice was audible only 80 percent of the time. He did not hear what was said because he was trying to determine why the taping equipment and phones were inoperative. Neither Detective Holder nor his technician could recall the substance of the Ford conversation during the visit.

On December 24, 1983, Detective Gailey received a report that Ford knew his conversations in the visiting area were being monitored. Mrs. Ford confirmed her knowledge about the taping of their visits by writing "Hello, IAD" (Internal Affairs Division) on her visitor's pass of December 28, 1983. Although the Ford conversations were taped on visits subsequent to the December 20, 1983, visit, that tape was the only tape offered into evidence by the prosecution.

Only Ford visits were taped. Von Villas visits were never taped.

### 2. *Issues Raised by Ford Regarding the December 20, 1983, Taping*

 Ford claims that his constitutionally cognizable expectation of privacy was violated by the LAPD taping of the conversation in spite of the fact that it was made in county jail. He narrows this claim by focusing on the fact that LAPD, the eavesdroppers, were an investigative agency that had no obligation to maintain security in the jail, unlike deputies of the sheriff's office, who did have such an obligation. Citing section 2600.[5] Ford claims the state Legislature has recognized the expectation of privacy of those in confinement. Assuming their expectation of privacy was constitutionally cognizable, Ford next claims that the search warrant at issue was fatally defective because it was not supported by probable cause and was overbroad.

Ford's next argument is based upon the privilege afforded married persons when they communicate in confidence. (Evid. Code, § 980.) He asserts that because the December 20 discussion was confidential, although carried on in a fairly loud manner, it is privileged.

Ford then asserts that the jail taping was made in violation of title III of the Omnibus Crime Control Act (18 U.S.C. § 2510 et seq.), the federal wiretap statutes.

As a final argument, Ford points out in his supplemental opening brief that the tape of the December 20, conversation should have been excluded from evidence because it was, in substantial part, unintelligible.

### 3. *There Was No Constitutionally Cognizable Expectation of Privacy Enjoyed by the Fords During the Taping*

In *Donaldson* v. *Superior Court* (1983) 35 Cal.3d 24 [196 Cal.Rptr. 704, 672 P.2d 110], the California Supreme Court held that the Fourth Amendment of the federal Constitution did not prohibit law enforcement from surreptitiously intercepting conversations of inmates in a police station. This holding was based on the *Donaldson* court's view that under federal constitutional law there is no right to privacy in a detention facility, and that the Fourth Amendment is not violated by such an interception of a conversation

---

[5]The statute provides: "A person sentenced to imprisonment in a state prison may, during any such period of confinement, be deprived of such rights, and only such rights, as is necessary in order to provide for the reasonable security of the institution in which he is confined and for the reasonable protection of the public."

between a prisoner and a visitor in a jail or in a police station. The *Donaldson* holding was based largely on dictum contained in *Lanza* v. *New York* (1961) 370 U.S. 139 [8 L.Ed.2d 384, 82 S.Ct. 1218], where jail officials surreptitiously intercepted a conversation between Lanza and his brother during a county jail visit with an electronic listening device. A transcript of the conversation was later used by a legislative committee to interrogate Lanza about possible corruption in New York's parole system. Holding that the transcript was not subject to suppression on Fourth Amendment grounds, the high court stated that "a jail shares none of the attributes of privacy of a home, an automobile, an office, or a hotel room. In prison, official surveillance has traditionally been the order of the day." (*Id.* at p. 143 [8 L.Ed.2d at p. 388].) The court did continue by stating that the usual confidential relationships would "continue to receive unceasing protection," despite the jailhouse setting. (*Id.* at p. 144 [8 L.Ed.2d at p. 388].)

Federal and California cases have repeatedly relied on the *Lanza* dictum as authority. In addition to *Donaldson*, in which the court expressly pointed out that *Lanza* had never been repudiated by the United States Supreme Court or other federal courts (*Donaldson* v. *Superior Court, supra*, 35 Cal.3d at pp. 28-30; see *Ahmad A.* v. *Superior Court* (1989) 215 Cal.App.3d 528, 535 [263 Cal.Rptr. 747]; *People* v. *Elwood* (1988) 199 Cal.App.3d 1365, 1370 [245 Cal.Rptr. 585]; see also, *United States* v. *Paul* (6th Cir. 1980) 614 F.2d 115, 116 [61 A.L.R.Fed. 816], cert. den., 446 U.S. 941 [64 L.Ed.2d 796, 100 S.Ct. 2165]; *United States* v. *Hearst* (9th Cir. 1977) 563 F.2d 1331, 1345, cert. denied 435 U.S. 1000 [56 L.Ed.2d 90, 98 S.Ct. 1656] [*Lanza* pointed out as persuasive authority].)

Although the "protected area" analysis of *Lanza* was later repudiated in *Katz* v. *United States* (1967) 389 U.S. 347, 351-352 [19 L.Ed.2d 576, 581-582, 88 S.Ct. 507], federal courts have consistently followed *Lanza* and upheld admission of monitored conversations in jails or police stations. (*United States* v. *Paul, supra,* 614 F.2d at p. 116.)[6]

In *Bell* v. *Wolfish* (1979) 441 U.S. 520 [60 L.Ed.2d 447, 99 S.Ct. 1861], the Supreme Court upheld a prison room search against a Fourth Amendment challenge by pretrial detainees. The court found that security is the main objective of prison administration; thus, prison officials must have broad latitude to adopt rules which protect the safety of inmates and corrections personnel, and which prevent escape or unlawful entry. (*Id.* at p. 547 [60 L.Ed.2d at p. 473].) The court noted, however, that "convicted prisoners do not forfeit all constitutional protections by reason of their conviction and

---

[6]*Katz* directed the focus of Fourth Amendment protection to ". . . people, not places." (*Katz* v. *United States, supra,* 389 U.S. at p. 351 [19 L.Ed.2d at p. 582].)

confinement in prison." (*Id.* at p. 545 [60 L.Ed.2d at p. 472].) No "Iron Curtain" separates prisoners from their constitutional rights. The court recognized that pretrial detainees possess at least the same rights as convicted prisoners. (*Ibid.*)

Citing *Lanza*, the court noted the possibility that "a person confined in a detention facility has no reasonable expectation of privacy with respect to his room or cell . . . ." (441 U.S. at p. 556 [60 L.Ed.2d at p. 480].) Furthermore, if any expectation of privacy was to be recognized in a detention scenario, it would definitely be of a diminished nature due to the security concerns involved. (*Id.* at p. 557 [60 L.Ed.2d at p. 480].) In *Bell*, it was assumed, arguendo, that the detainee had a diminished expectation of privacy. Still the Fourth Amendment was not violated by the unannounced search of his cell. In this regard, the court deferred to the judgment of the prison administrators. (*Id.* at p. 547 [60 L.Ed.2d at p. 473].)

The more recent Supreme Court decision of *Hudson* v. *Palmer* (1984) 468 U.S. 517 [82 L.Ed.2d 393, 104 S.Ct. 3194], also involved a random search of an inmate's cell. By citing the test set forth in *Katz*, the court found that for Fourth Amendment protection to apply, the person asserting the Fourth Amendment rights must have a subjective expectation of privacy and the expectation must be one that "society is prepared to recognize as reasonable." (*Katz* v. *United States, supra*, 389 U.S. 347, 360-361 [19 L.Ed.2d 576, 587-588] (conc. opn. of Harlan, J.).) The court stressed the importance of the latter requirement. (*Hudson* v. *Palmer, supra*, 468 U.S. at p. 525, fn. 7 [82 L.Ed.2d at p. 402].) By utilizing a balancing test, the court determined that "society is not prepared to recognize as legitimate any subjective expectation of privacy that a prisoner might have in his prison cell. . . ." (*Id.* at p. 526 [82 L.Ed.2d at p. 402].) The interest of society in the security of its penal institutions outweighed the interest of the prisoner in privacy within his cell. (*Ibid.*)

The *Hudson* court ultimately held that "[a] right to privacy in traditional Fourth Amendment terms is fundamentally incompatible with the close and continual surveillance of inmates and their cells required to ensure institutional security and internal order." (468 U.S. at pp. 527-528 [82 L.Ed.2d at pp. 403-404]; see *Nakao* v. *Rushen* (9th Cir. 1985) 766 F.2d 410, 412 [citing *Hudson*—no expectation of privacy exists in a prisoner's cell].)

The Ninth Circuit Court of Appeals has dealt similarly with Fourth Amendment issues arising in jail settings. In *United States* v. *Hearst, supra*, 563 F.2d 1331, a conversation with a pretrial detainee and a visitor on a jail's telephone-like intercommunication system was monitored and recorded by

jail officials in accordance with an established jail policy. The policy was to record all conversations by detainees who were involved in "very publicized cases or high security problems." This particular tape was provided to the Federal Bureau of Investigation and a transcript of the tape was read to the jury during trial. (*Id.* at p. 1344.)

In *Hearst*, the court analogized the facts to *Lanza* and found *Lanza* to be persuasive authority, despite the seeming repudiation of the *Lanza* "protected area" analysis in *Katz*. Additionally, the court relied on *Katz* to defeat the detainee's Fourth Amendment claim. The court held that "[a]n intrusion by jail officials pursuant to a rule or policy with a justifiable purpose of imprisonment or prison security is not violative of the Fourth Amendment." (See *United States* v. *Dawson* (9th Cir. 1975) 516 F.2d 796, 805-806; *United States* v. *Savage* (9th Cir. 1973) 482 F.2d 1371, 1373, cert. denied, 415 U.S. 932 [39 L.Ed.2d 491, 94 S.Ct. 1446] [absent a showing of some justifiable purpose of imprisonment or prison security, a prisoner's letter should not be intercepted or photocopied].)

Ford urges that *United States* v. *Cohen* (2d Cir. 1986) 796 F.2d 20, certiorari denied, 479 U.S. 854 [93 L.Ed.2d 122, 107 S.Ct. 189], is virtually on point with the fact scenario in the case at bar. In *Cohen*, a pretrial search of an inmate's cell was initiated by the prosecution. This was a warrantless search performed "solely to obtain information for a superseding indictment." The court held that the detainee retained a diminished Fourth Amendment expectation of privacy in his cell and this warrantless search violated this constitutional right. (*Id.* at p. 24.)

Ford argues that since the prosecution did the taping, the purpose could have been to gather evidence, rather than to protect Ford and the prospective witnesses.

*Cohen* is easily distinguishable. In *Cohen*, the sole reason for the search was to gather evidence; in Ford's case, the purpose of the seizure was not only to gather evidence, but also to ensure jail security and public safety. Also, *Cohen* involved a cell search, rather an eavesdrop on a jailhouse conversation. The only similarity this case shares with *Cohen* is the fact that the prosecution performed the search. This factor alone does not compel us to follow *Cohen*, a Second Circuit Court of Appeal decision.

As Ford acknowledges, if he and his wife lacked a subjective expectation of privacy during the December 20 conversation, then he would have no basis upon which to assert a Fourth Amendment claim. The trial judges below found that Ford did not entertain such an expectation of privacy.

Indeed, given the attendant circumstance surrounding the conversation, including the loud voices of the participants, inter alia, we are convinced Ford's request that the protections of the Fourth Amendment be invoked through suppression of the taped conversation was properly rejected.

Whether the taping was performed by LAPD or those in charge of jail security, the sheriff's department, in our view, has no bearing on the Fourth Amendment issues raised by Ford concerning the December 20 conversation.

### 4. The Search Warrant Authorizing Seizure of the Conversations

 Ford asserts that the search warrant authorizing the seizure of the December 20 conversation of the Fords was overbroad and did not establish adequate probable cause as to Ford.

The provisions of the search warrant authorizing the eavesdropping are quite specific. The place to be searched was described as follows: ". . . by installation and operation of electronic surveillance and recording equipment in areas and on internal telephone systems not part of a public system used by inmates Richard Herman Ford and Robert Anthony Von Villas for conversing with any persons other than the attorneys for those inmates (for Property Item No. 4)."[7]

The warrant clearly sets forth that the taping was to occur only in the jail visiting rooms on the intercom telephone system, not on public telephones. When one considers that the purpose of the taping was to acquire information about the plans of either Ford or Von Villas to kill witnesses or each other, or to engage in any other future criminal conduct, the scope of the search warrant is very specific. The trial court judge so held in ruling that the conversations were intercepted in accordance with the restrictions set forth in the warrant.

 Ford alleges that the affidavit supporting the search warrant does not set forth sufficient probable cause as to Ford and therefore the tapes should be suppressed on Fourth Amendment grounds. The probable cause for the warrant was obtained by the use of jailhouse informants who relayed information to Deputy Dvorak who, in turn, relayed the information to Detective Gailey.

---

[7]Property item No. 4 was defined in the warrant as follows:

"Conversation and writings in which Richard Herman Ford or Robert Anthony Von Villas makes any statement regarding future plans to intimidate, harass, injure, or kill any witness or any other person or to engage in any other criminal conduct; and all other writings to and from Richard Herman Ford and Robert Anthony Von Villas, except those to or from the attorney of either."

On or about October 31, 1983, Love stated that Von Villas offered him $30,000 if he would either kill Bruce Adams, a key prosecution witness in the robbery-attempted murder case then pending against him, or kidnap Adams's son. Also, Von Villas offered money to have Joan Loguercio, the victim of the attempted murder charges, killed. Von Villas told Love that his wife knew about his criminal activity and had contacted "the syndicate" to track down the whereabouts of Mr. Adams and his son. On or about November 19, 1983, Von Villas asked Love if he could get to Ford and kill him. On November 22, 1983, Von Villas told Love that Judy Von Villas, his wife, had located Mr. Adams and was going to pay prostitutes to testify that Mr. Adams had Von Villas and Ford set up. Von Villas also told Love that he was a hired "hitman," and that he and two others had shot a man in Northridge. Von Villas also stated that he was present when Ford killed the man who had raped Ford's wife.

Ford was also approached by an inmate informant, Bill Brown, while in jail. However, Ford was suspicious of Brown and presumably did not disclose any information to him that became the basis for the affidavit.

In the affidavit Detective Gailey stated that through his "education, training and experience in many similar investigations" he believed ". . . Robert and Judith Von Villas are continually discussing and will continue to discuss plans to fabricate evidence, intimidate and murder witnesses, and obstruct justice, during their conversations at the county jail; that both Von Villas and Ford may engage in such communications, oral and written, with other persons. . . ." Based on informant Love's and Detective Gailey's statements, the magistrate concluded that the affidavit established probable cause for issuance of the search warrant.

Ford asserts, however, that there was no probable cause which linked Ford to the alleged criminal activity of Von Villas. Ford contends that the statements of the informant relate only to Von Villas and not Ford, and that Detective Gailey's opinion is based on a hunch and not on solid probable cause.

■ To establish probable cause, one must show a probability of criminal activity; a prima facie showing is not required. Also, "[t]he evidence must be seen and weighed as understood by those versed in the field of law enforcement." (*People* v. *McNabb* (1991) 228 Cal.App.3d 462, 463 [279 Cal.Rptr. 11]; see *People* v. *Rochen* (1988) 203 Cal.App.3d 684 [250 Cal.Rptr. 73].)

In *People* v. *Spears* (1991) 228 Cal.App.3d 1 [278 Cal.Rptr. 506], the court held that in determining the sufficiency of an affidavit in support of a

search warrant an officer's law enforcement experience, as well as inferences or deductions apparent to trained law enforcement officers may be considered. ■ Here, Detective Gailey logically inferred that if Von Villas was planning to kill witnesses, Ford could well be acting in concert with him based upon his knowledge of their past joint criminal activity.

The affidavit provided the magistrate with a "substantial basis" for finding probable cause. (See *People* v. *Schilling* (1987) 188 Cal.App.3d 1021 [233 Cal.Rptr. 744].) The trial judge properly held that the magistrate did not act in bad faith when he issued the warrant based upon the facts contained in the affidavit.

■ Even if it were determined that the warrant was improvidently issued because there was insufficient probable cause, the tape of the December 20 conversation was still properly admitted because the officers executed the warrant in good faith. ■ " '[S]earches pursuant to a warrant will rarely require any deep inquiry into reasonableness,' [citation], for 'a warrant issued by a magistrate normally suffices to establish' that a law enforcement officer has 'acted in good faith in conducting the search.' " (*United States* v. *Leon* (1984) 468 U.S. 897, 922 [82 L.Ed.2d 677, 104 S.Ct. 3405].)

■ The exceptions to the rule set forth in *Leon* are not applicable in this case.

There is no evidence that in issuing the warrant the magistrate "was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth." (468 U.S. at p. 923 [82 L.Ed.2d at p. 699].)

Likewise, Ford produced no evidence that the issuing magistrate abandoned his role as a neutral and detached judicial officer in signing the search warrant. (468 U.S. at p. 923 [82 L.Ed.2d at p. 699].)

Furthermore, Ford did *not* demonstrate below that the officers were "relying on a warrant based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.' " (468 U.S. at p. 923 [82 L.Ed.2d at p. 699].)

The officers were certainly entitled to rely on the magistrate's *legal determination* that a warrant could properly issue. They were not required (and obviously were not qualified) to second-guess the magistrate's determination of the affidavit's sufficiency. "Penalizing the officer for the magistrate's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations." (468 U.S. at p. 921 [82 L.Ed.2d at p. 699], fn. omitted.)

Finally, Ford did not demonstrate in any way that the warrant was "so facially deficient—i.e, in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably [have] presume[d] it to be valid." (468 U.S. at p. 923 [82 L.Ed.2d at p. 699].)

### 5. *Section 2600 Provides No Remedy for Ford*

Pursuant to section 2600, a person imprisoned in state prison may "be deprived of . . . only such rights, as is necessary in order to provide for the reasonable security of the institution . . . and . . . the public." Section 2601 designates certain retained civil rights of prisoners, including the right to have personal visits.

*De Lancie* v. *Superior Court* (1982) 31 Cal.3d 865 [183 Cal.Rptr. 866, 647 P.2d 142], held that absent security concerns, conversations between pretrial detainees and visitors could not be monitored solely to gather evidence to be used at their upcoming trials. (*Id.* at pp. 871-872.) *De Lancie*'s holding, however, did not turn upon whether there was a reasonable expectation of privacy in a custodial setting; rather, it stated that any monitoring in violation of sections 2600 and 2601 violates the fundamental right of privacy guaranteed by the California Constitution article I, section 1.

The *De Lancie* decision emphasized that a right to privacy must exist in jails or prisons pursuant to California statutory law. Sections 2600 and 2601 restore to inmates civil rights which are compatible with jail security. The court opined that there is an obvious need for persons confined in jail to enjoy private communications with spouses and family. (31 Cal.3d at p. 876.) Furthermore, the *De Lancie* court rejected *North* v. *Superior Court* (1972) 8 Cal.3d 301 [104 Cal.Rptr. 833, 502 P.2d 1305, 57 A.L.R.3d 155], which held that ordinarily there can be no expectation of privacy in a jail or a police station.

In *Donaldson* v. *Superior Court, supra,* 35 Cal.3d at pages 28-30, decided just one year after *De Lancie,* the California Supreme Court opined that "no federal case has repudiated the *Lanza* dictum or excluded a jail or police conversation from evidence. [Citation.] If occasional state court cases such as *De Lancie* take a different course, they do so on state not federal grounds. Bound in matters of federal law by the United States Supreme Court, which never rejected its dictum in *Lanza* v. *New York,* and influenced by decisions of the lower federal courts, we are impelled to conclude that the *Lanza* dictum continues to control in federal law." (*Id.* at p. 30.)

This view has been followed in *People* v. *Elwood, supra,* and *Ahmad A.* v. *Superior Court, supra;* both cases hold that there is no justifiable expectation

of privacy as to remarks made in a jail interview room. Also, *Elwood* and *Ahmad A.* acknowledge the existence of a California statutory right to privacy for prisoners, but noted that section 2600 et seq. simply set forth rights without providing a suppression remedy for violations thereof. (*Elwood, supra,* 199 Cal.App.3d at p. 1371; *Ahmad A., supra,* 215 Cal.App.3d at p. 536.) "The California Supreme Court has made clear that in the search and seizure context, the Article I, section 1, privacy clause has never been held to establish a broader protection than that provided by the Fourth Amendment of the United States Constitution or Article I, section 13 of the California Constitution." (*Elwood, supra,* 199 Cal.App.3d at pp. 1371-1372.)

 In conclusion, Ford will find little solace in calling upon section 2600 for providing the remedy of suppression of the December 20 tape. No such remedy is statutorily available. The trial judge correctly ruled that Ford's reliance on Penal Code section 2600 et seq. was misplaced.

 6. *California Evidence Code Section 980, the Privilege for Confidential Marital Communications, Provides No Remedy for Ford*

Evidence Code section 980 states, in pertinent part:

"Subject to Section 912 and except as otherwise provided in this article, a spouse . . . , whether or not a party, has a privilege during the marital relationship and afterwards to refuse to disclose, and to prevent another from disclosing, a communication if he claims the privilege and the communication was made in confidence between him and the other spouse while they were husband and wife."

A communication between married persons is "presumed to have been made in confidence and the opponent of the claim of privilege has the burden to establish that the communication was not confidential." (Evid. Code, § 917; see *People* v. *Carter* (1973) 34 Cal.App.3d 748, 752 [110 Cal.Rptr. 324].) "The [marital privilege] may be asserted to prevent testimony by anyone including eavesdroppers." (*North* v. *Superior Court, supra,* 8 Cal.3d 301, 310, italics omitted.)

 Ford urges that the December 20 conversation was "confidential" within the meaning of Evidence Code section 980. He contends that the trial court erred when, in considering Ford's marital privilege claim, it carried out an expectation of privacy analysis. Ford's contention is wrong.

 To make a marital communication " 'in confidence,' one must intend nondisclosure [citations] and have a reasonable expectation of privacy."

(*People* v. *Mickey* (1991) 54 Cal.3d 612, 654 [286 Cal.Rptr. 801, 818 P.2d 84].) Both factors must be shown before invocation of the marital privilege will be honored. As the *Mickey* court stated, "the claimant of the confidential marital communication privilege has the burden to prove, by a preponderance of evidence, the facts necessary to sustain the claim." (*Id.* at p. 655; see 1 Jefferson, Cal. Evidence Benchbook (2d ed. 1982) § 25.2(p), p. 715.) *Mickey* acknowledges that the claimant is aided by the statutory presumption of Evidence Code section 917. (*People* v. *Mickey, supra,* 54 Cal.3d at p. 655.)

 Here, the Fords, as indicated, had no justifiable expectation of privacy during their December 20 conversation. They were in a regular jail visiting room speaking loudly to each other through the plexiglass with knowledge that a guard was watching them. Their conduct clearly indicated there was no expectation of privacy during the conversation. Further, their conduct demonstrated that they did not intend nondisclosure, the second prong of the *Mickey* test.

In short, the conversation was not made "in confidence."

Ford analogizes the facts surrounding the December 20 conversation to those of *North* v. *Superior Court, supra,* 8 Cal.3d 301. He urges that the unique factual circumstances of *North*, which allowed the conversants to successfully claim a marital privilege are similar to the facts of this case. Once again, Ford's argument misses the mark.

In *North*, a pretrial detainee and his wife were led to a detective's private office. The detective told them they could talk and was present for the initial contact between the detainee and his wife. The detective then left them entirely alone. Nothing the detective did or said indicated that the couple's conversation would be taped. (8 Cal.3d at p. 311.) The court held that the detective's actions had created an expectation that the couple's conversation would be private. This expectation was violated by the surreptitious taping. The court found that a search had occurred within the meaning of the Fourth Amendment, and that the marital privilege had been violated due to the deliberate creation of a situation in which marital privacy could reasonably be expected to exist. (*Id.* at p. 311.) This couple was "lulled" into this belief. (Cf. *People* v. *Finchum* (1973) 33 Cal.App.3d 787, 791 [109 Cal.Rptr. 319] [merely leaving communicants alone in a room was not an improper attempt to create an expectation of privacy]; *In re Joseph A.* (1973) 30 Cal.App.3d 880, 885-886 [106 Cal.Rptr. 729] [no implied representation of privacy by granting a visitor's request to see defendant "by himself"; the words "by himself" were ambiguous and could reasonably be construed as meaning "away from other persons in custody" rather than "in private."].)

Further, the *North* court held that when "a communication is made 'under circumstances where others could easily overhear is a strong indication that the communication was not intended to be confidential and is, therefore, unprivileged. [Citations.]' (Evid. Code, § 917, comment, *supra*; see *People* v. *Santos* (1972) 26 Cal.App.3d 397, 402 [102 Cal.Rptr. 678].)" (*North* v. *Superior Court, supra,* 8 Cal.3d at p. 311.) Additionally, the court noted that "eavesdropping upon or recording a jailhouse communication between spouses" is not barred by section 630 et seq. (§ 636; *North* v. *Superior Court, supra,* 8 Cal.3d at p. 312, fn. 6.) Because section 636 does not mention marital communications, recording marital conversations appears permissible and such conversations will be admissible absent the necessary showing of an expectation of privacy and confidentiality.

In the case at bar, virtually no "lulling" factors are present. The Fords met in an ordinary jailhouse visiting area. Although the Fords' usual meetings were in module 7000 and they were directed to module 6000 when the taping occurred, these areas are virtually identical. Both modules contain several phone stations and a control booth. Both areas are used for regular visits of all inmates and are within the jail confines.

The fact that the room was emptied of other visitors does not match the deliberate lulling attempts made by the officer in *North*. The Fords were never truly alone as the guard, to their knowledge, was always present in the control booth. Mrs. Ford was well aware of this fact because she had to show him her identification and guest pass upon arrival to the area. Ford argues that he and Mrs. Ford did not know that the guard could hear them. The facts belie such a contention. In short, none of the factors were present which would warrant suppression of the tapes under a *North* "lulling" analysis.

In sum, no valid assertion of the marital privilege can successfully be made by the Fords because there was no justifiable expectation of privacy and no intent of nondisclosure as to their conversation.

Evidence Code section 981 states that "[t]here is no privilege under this article if the communication was made, in whole or in part, to enable or aid anyone to commit or plan to commit a crime or a fraud."

The trial court determined that the December 20 conversation was made in full or in part to enable the commission of a crime; the crime being the obstruction of justice and removal of evidence related to a criminal activity. On the tape, Ford advises Mrs. Ford to throw away her personal letters from him. Additionally, he states that he will get rid of something. These statements can easily be construed as attempts to obstruct justice, which would

warrant application of the "crime or fraud" exception to the marital privilege. (See *People* v. *Santos, supra,* 26 Cal.App.3d 397, 402-403 [conversation about destroying evidence was within the limitation on the marital privilege].)

In addition, Evidence Code section 912 provides, in pertinent part, that ". . . the right of any person to claim a privilege provided by Section . . . 980 . . . is waived with respect to a communication protected by such privilege, if any holder of the privilege, without coercion, has disclosed a significant part of the communication."

Here the Fords were speaking very loudly to one another—loudly enough to be heard beyond the plexiglass which separated them. They knew or reasonably should have known that third parties in the person of sheriff's deputies were present.

Clearly the trial court was reasonable in concluding that the marital privilege provided by section 980 was not available to Ford on any number of theories. As indicated, the conversation of December 20 was not made "in confidence." Further, there was insufficient evidence to conclude that the Fords were "lulled" into the belief that their conversations were not being overheard. The trial court also determined that the conversation in question may well not have been privileged because it ". . . was made . . . to commit or plan to commit a crime or fraud" pursuant to Evidence Code section 981, the "crime or fraud" exception. Finally, the trial court was faced with sufficient evidence to warrant the conclusion that even if the December 20 conversation was privileged, any such privilege was waived pursuant to Evidence Code section 912.

Each of the findings of the trial court regarding the marital privilege are supported by substantial evidence. The conversation of December 20 was not privileged under Evidence Code section 980.

### 7. *Title 18 United States Code Section 2510 et seq.—The Federal Wiretap Statute*

Title III of the Omnibus Crime Control and Safe Streets Act of 1968 (18 U.S.C. § 2510 et seq.) criminalizes the willful interception or disclosure of certain wire or oral communications and prohibits, inter alia, the introduction into evidence of communications gathered or derived in violation of its terms. It also prescribes the procedural requirements which must be fulfilled before a wire interception, inter alia, can legally take place.

 The December 20 taping does not fall within the scope of title 18 United States Code section 2510 et seq. The federal wiretap law, therefore, has no bearing on the issues before this court.

Title 18 United States Code section 2510(1) defines a "wire communication" as follows:

" 'Wire communication' means any aural transfer made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception . . . furnished or operated by any person engaged in providing or operating such facilities for the transmission of interstate or foreign communications or communications affecting interstate or foreign commerce and such term includes any electronic storage of such communication, but such term does not include the radio portion of a cordless telephone communication that is transmitted between the cordless telephone handset and the base unit. . . ."

The Fords' conversation is not within the definition of a "wire communication" because their conversation took place on the jail's intercommunication system. This system did not have outside lines which could affect interstate commerce and was not operated by a common carrier. (See *People v. Santos, supra*, 26 Cal.App.3d 397, 402 [conversation on jail phone system was not a "wire communication" because "it involved no facility furnished or operated by a common carrier"].)

Ford alleges that the conversation qualifies as an "oral communication" as defined in 18 United States Code section 2510(2). Under that section, an " 'oral communication' " is defined as any "oral communication uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation, but such term does not include any electronic communication." Hence, there appears to be a requirement that the conversants exhibit a reasonable expectation of privacy in order for their conversation to fall within the 18 United States Code section 2510(2) definition for an "oral communication." (See *People v. Santos, supra*, 26 Cal.App.3d at 402; *In re Joseph A., supra*, 30 Cal.App.3d 880, 883; *United States v. Harrelson* (5th Cir. 1985) 754 F.2d 1153, 1169 [holding that a conversation between an inmate and visitor was not an "oral communication" because the parties had no expectation of privacy regarding the jail intercom telephone].)

In *Santos*, the federal wiretap statute was found inapplicable because the parties did not have an expectation of privacy and the mode of communication did not involve a common carrier. The couple spoke on an intercom system in the visiting room at the jail. During their conversation, the husband warned his wife that the phones could be tapped. Nonetheless, he continued to speak in a hushed tone and thus made incriminating statements

which were recorded. Additionally, the court cited *Lanza* v. *New York, supra,* 370 U.S. 139, in support of the holding that no expectation of privacy is violated by taping a conversation between a jail inmate and his visitor. (*People* v. *Santos, supra,* 26 Cal.App.3d at pp. 400, 402.)

Here the Fords did not exhibit a reasonable expectation of privacy when they conversed on December 20, 1983. In short, because the Fords' conversation does not qualify as an "oral communication," title 18 United States Code section 2510 et seq. does not apply to the issue before us.

### 8. *The Unintelligibility of the December 20 Conversation*

 Ford asserts that the tapes of the December 20 conversation should not have been admitted because they are so unintelligible that their admission caused great prejudice. "A finding as to admissibility of evidence under Evidence Code section 352 is left to the sound discretion of the trial court and will not be disturbed unless it manifestly constituted an abuse of discretion. (*People* v. *Hall* (1980) 112 Cal.App.3d 123, 127 [169 Cal.Rptr. 149].)" (*People* v. *Siripongs* (1988) 45 Cal.3d 548, 574 [247 Cal.Rptr. 729, 754 P.2d 1306]) Here, the trial court properly ruled that the tapes were admissible after carefully balancing whether their prejudicial impact would outweigh their probative value. There was no abuse of discretion.

"To be admissible, tape recordings need not be completely intelligible for the entire conversation as long as enough is intelligible to be relevant without creating an inference of speculation or unfairness." (*People* v. *Demery* (1980) 104 Cal.App.3d 548, 559 [163 Cal.Rptr. 814]; *People* v. *Miley* (1984) 158 Cal.App.3d 25, 36 [204 Cal.Rptr. 347] [tape recording containing unintelligible parts was not unduly prejudicial as admitted]; *People* v. *Phillips* (1985) 41 Cal.3d 29, 78 [222 Cal.Rptr. 127, 711 P.2d 423] [letters held admissible because the letter's clear meaning was not affected by the unintelligible parts]; *People* v. *Finch* (1963) 216 Cal.App.2d 444, 454 [30 Cal.Rptr. 901] [recordings admissible absent a showing that any statement was a misstatement or that material statements were missing].)

In *People* v. *Siripongs, supra,* 45 Cal.3d 548, the defendant's telephone conversation was taped without his knowledge. Despite certain portions of the recording being unintelligible, the court held that the tape was admissible because the understandable portions demonstrated defendant's efforts to remove incriminating evidence from his home. The court further noted that comprehensive transcripts of the recording were made by interpreters. The Court of Appeal found no abuse of discretion in admitting the tapes. (*Id.* at p. 574.)

The trial court reviewed the recordings of the December 20 conversation and was aware of the pauses and gaps contained therein, as well as those

parts that were clearly intelligible and probative. Mrs. Ford testified at trial as to many portions of the tapes that contained gaps or unintelligible comments. Her efforts were obviously focused upon interpretations of the gaps or unintelligible comments which would prove exculpatory rather than inculpatory.

The trial court's conclusion that the comments on the tape would not lead to improper speculation by the jury was reasonable. In short, Ford's rights to due process under the federal Constitution were not violated by the admission of the tapes. Further, admission of the tapes did not constitute a miscarriage of justice within the meaning of article VI, section 13 of the California Constitution.

### C. The Trial Court's Order Excluding Impeachment Evidence in the Form of Darlis Chefalo's Three Prior Felony Burglary Convictions, and Evidence of the Alleged Reasons for Her Hatred of LAPD Officers

#### 1. Darlis Chefalo's Prior Convictions

Before Ms. Chefalo was called to testify to her activities in providing Von Villas and Ford with wigs, makeup and attendant appliances for their application, as well as instructions in their use and care, they moved *in limine* for permission to impeach her with felony burglary convictions she suffered in 1959, 1963, and 1965. She had been paroled from her last felony in January of 1968, some 20 years before the trial, but did suffer 2 misdemeanor convictions in 1977. No effort was made to use the misdemeanors for impeachment purposes, and it was agreed that the burglary convictions were crimes of moral turpitude, thus relevant to the issue of credibility. (*People* v. *Muldrow* (1988) 202 Cal.App.3d 636, 645 [248 Cal.Rptr. 891].)

Von Villas and Ford asserted that Ms. Chefalo was biased against LAPD officers, as she had so indicated to Jack Stone, the makeup artist who had referred them to her. Although she denied that she had an interest in seeing a conviction in the case, her alleged hatred of LAPD officers, according to Von Villas and Ford, would militate against such a conclusion. Her impeachment, therefore, was deemed essential because her credibility and bias were in issue. Ford's view was that her testimony would reflect that his motive in obtaining the disguises was for purposes of fulfilling the objectives of a criminal enterprise, while his true motive was to use the wigs and makeup so that the pursuit of his wife's assailant would be facilitated.

The prosecution argued that the convictions were remote in that the last felony conviction occurred 20 years before trial.

The court conducted the weighing process called for by Evidence Code section 352 and found that Ms. Chefalo was but 19 at the time of her first conviction some 29 years before trial, 23 at the time of her second conviction, and 25 at the time of the third conviction. The court's conclusion was that the convictions ". . . are too remote in time for there to be questioning on."

### 2. The Denial of the Motion in Limine Requesting Permission to Impeach Ms. Chefalo

Article I, section 28, subdivision (f), of the California Constitution—adopted by the voters on June 8, 1982, when Proposition 8 was approved by the electorate—declares in pertinent part that "Any prior felony conviction of any person in any criminal proceeding . . . shall subsequently be used without limitation for purposes of impeachment . . . in any criminal proceeding."

In *People* v. *Castro* (1985) 38 Cal.3d 301 [211 Cal.Rptr. 719, 696 P.2d 111], the Supreme Court held that trial courts retain their discretion under Evidence Code section 352 to bar impeachment with such convictions when their probative value is substantially outweighed by their prejudicial effect. (38 Cal.3d at pp. 306-313 (plur. opn.); *id.* at p. 323 (conc. & dis. opn. of Bird, C. J.).) The court made clear that in exercising their discretion, trial courts should continue to be guided, but not bound, by the factors set forth in *People* v. *Beagle* (1972) 6 Cal.3d 441 [99 Cal.Rptr. 313, 492 P.2d 1], and its progeny. When the witness subject to impeachment is not the defendant, those factors prominently include whether the conviction (1) reflects on honesty and (2) is near in time. (*People* v. *Woodard* (1979) 23 Cal.3d 329, 335-337 [152 Cal.Rptr. 536, 590 P.2d 391]; see also *People* v. *Collins* (1986) 42 Cal.3d 378, 381, 391-392 [228 Cal.Rptr. 899, 722 P.2d 173].)

In *People* v. *Clair* (1992) 2 Cal.4th 629 [7 Cal.Rptr.2d 564, 828 P.2d 705], the Supreme Court upheld the ruling of a trial court excluding from evidence the felony conviction of a third party witness because it was remote. In that case the prosecution moved the trial court *in limine* for an order prohibiting defendant from impeaching an important third party witness with a felony conviction (voluntary manslaughter) suffered by the witness in 1965, some 22 years before the trial. Relying on *Castro, Collins,* and *Beagle,* the prosecutor claimed that the probative value of such impeachment would be substantially outweighed by its prejudicial effect. Although admitting that a voluntary manslaughter conviction did necessarily involve moral turpitude for purposes of article I, section 28, subdivision (f) of the California Constitution, the prosecutor, as in the instant case, argued that it was remote

in time and was not followed by others. The trial court excluded impeachment by use of the voluntary manslaughter prior. "I find that that prior is marginally relevant but highly prejudicial. I'm going to exclude it under [Evidence Code section] 352 primarily because of the remoteness of time." (2 Cal.4th at p. 655.)

 A ruling by a trial court of the sort made below is reviewed for abuse of discretion. (*People* v. *Stewart* (1985) 171 Cal.App.3d 59, 65 [215 Cal.Rptr. 705].) Although other trial courts may well have concluded otherwise, we cannot say that the court here "exceed(ed) the bounds of reason. . . ." (*Ibid.*) The exclusion of the felony convictions for impeachment purposes was appropriate.

### 3. The Denial of the Request for Introduction Into Evidence of the Alleged Reasons for Ms. Chefalo's Hatred of LAPD Officers

Von Villas and Ford wished to impeach Ms. Chefalo not only through use of her prior felony convictions, but also by questioning her about specific instances in her life which caused her to generate a virulent hatred of LAPD. This hatred apparently arose because her child allegedly was raped by LAPD officers. The court precluded examination of Ms. Chefalo on the facts and circumstances which caused Ms. Chefalo to dislike LAPD, although Von Villas and Ford were allowed to question her generally about her feelings toward the organization.

The trial court's ruling was within its discretion. The court's analysis and conclusion as to the impeachment material that was admissible against her pursuant to Evidence Code section 352 and that which was either too tenuous or remote to be admissible was reasonable. (*Ibid.*) To conclude that Ms. Chefalo would testify falsely against Von Villas and Ford merely because she at some time became aware that they were LAPD officers, because of some alleged past wrong to her child by LAPD officers, was tenuous in the eyes of the trial court. The ruling of the trial court was reasonable and clearly was not an abuse of its discretion. (*Ibid.*) Ms. Chefalo was explicit in stating to the jury that she utterly disliked LAPD. To allow counsel to explore the underlying reasons for her negative feelings would contribute little or nothing to the conclusion which Von Villas and Ford wished the jury to reach: that she hated them personally and would do anything to see them convicted.

### 4. The Sixth Amendment Right of Confrontation

 Von Villas and Ford finally argue that the trial court's restriction of their impeachment of Ms. Chefalo amounted to a curtailment of cross-examination in violation of their Sixth Amendment right of confrontation,

citing *Olden* v. *Kentucky* (1988) 488 U.S. 227 [102 L.Ed.2d 513, 109 S.Ct. 480]. They thus claim that it cannot be deemed that the court's errors were harmless beyond a reasonable doubt. They also claim that the trial court's alleged errors so seriously affected an extremely close case on the evidence presented as to constitute a miscarriage of justice within the meaning of the California Constitution, citing article VI, section 13, thereof.

We disagree. The confrontation clause "guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." (*Delaware* v. *Fensterer* (1985) 474 U.S. 15, 20 [88 L.Ed.2d 15, 19, 106 S.Ct. 292], (*per curiam*) italics in original.) Here, Von Villas and Ford were given such an opportunity. The confrontation clause allows "trial judges . . . wide latitude . . . to impose reasonable limits on . . . cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." (*Delaware* v. *Van Arsdall* (1986) 475 U.S. 673, 679 [89 L.Ed.2d 674, 683, 106 S.Ct. 1431].) The trial court did that which it was permitted in restricting cross-examination of Ms. Chefalo.

An examination of the entire record leads us to conclude that the trial court's ruling restricting counsel in its examination of Ms. Chefalo did not constitute a miscarriage of justice within the meaning of article VI, section 13 of the California Constitution.

D. *Introduction of the Ford February 1983 Calendar With the Blackened Out 23d Date*

On December 20, 1983, LAPD officers seized a 1983 calendar from Ford's residence. The date February 23 was blackened out completely. Mr. Weed disappeared on or about that date, as the evidence at trial indicated. The trial court allowed the seized calendar into evidence over the objection of Von Villas that it was inadmissible hearsay. The prosecution successfully argued that although the calendar may well constitute hearsay as an implied statement or as nonassertive conduct, it fell within the coconspirator admission exception to the rule against hearsay and was admissible against both Ford and Von Villas. (Evid. Code, § 1223.)

Section 1223 provides in pertinent part that the admission of a coconspirator can be admissible if:

"(a) The statement was made by the declarant while participating in a conspiracy to commit a crime . . . and in furtherance of the objective of that conspiracy;

"(b) The statement was made prior or during the time that the party was participating in the conspiracy; and

"(c) The evidence is offered either after . . . or . . . subject to the admission of such evidence."

Extensive scientific analysis disclosed no writing or other identifiable marks other than the blackening of the date on the calendar.

 First, Von Villas asserts that because there was no direct evidence presented to prove that Ford personally blackened the date, that an insufficient foundation was laid to admit the calendar under section 1223, this in spite of the trial court's finding that ". . . it still seems to the court extremely logical that the person that blacked that out was, indeed, Mr. Ford. . . ." In fact, according to Von Villas, the testimony of Ford's son to the effect that he blackened the date compels a contrary conclusion.

Second, Von Villas claims that even if the evidence was sufficient to prove that Ford blackened the date, the blackened date does not prove that it was an admission of any kind, thus section 1223 is inapplicable.

Third, he claims that because there was insufficient evidence produced to prove when the date was blackened, section 1223 is inapplicable because that section requires that the statement be made ". . . while participating in a conspiracy to commit a crime. . . ." Finally, Von Villas argues that there was no evidence presented that the blackening of the date was done in furtherance of the conspiracy, i.e., no motive was shown, a necessary element for invocation of section 1223, which requires that the statement be made ". . . in furtherance of the objective of that conspiracy. . . ."

The respondent focuses on upholding the trial court's decision to admit the blackened calendar by dismissing the theory proffered by the prosecution in support of its admission at trial. Instead, the blackened date on the calendar is characterized as not being hearsay at all since it was not a "statement" as defined in Evidence Code section 225.[8] Further, the blackened calendar date was not offered to prove the truth of the matter contained therein, but rather was offered as circumstantial evidence of Ford's knowledge, or state of mind, at the time the blackening occurred.

Although respondent's argument to the effect that the blackened calendar date was not hearsay at all because it was not a statement is attractive, and

---

[8]"§ 225. 'Statement'. 'Statement' means (a) oral or written verbal expression or (b) nonverbal conduct of a person intended by him as a substitute for oral or written verbal expression."

its contention that, in any event, the exhibit was only relevant as circumstantial evidence of Ford's state of mind (knowledge) has its allure, we are compelled to decide the issue before us. That issue is whether the trial court's ruling below was correct: does the blackened calendar date fall within the purview of section 1223? Further, we face the argument of Von Villas as to the admissibility of the exhibit against *him*, thus a determination that the blackened calendar date was or was not admitted to show Ford's state of mind is irrelevant, since Ford's state of mind is uniquely attributable to Ford, not Von Villas, absent consideration of a different legal theory.

The trial court was required to determine that the proponent of the evidence, the prosecution, carried its burden of proof as to the preliminary or foundational facts before admitting the exhibit. This meant that evidence that was sufficient for a reasonable trier of fact to make a finding of the existence of the following had been presented. First, the statement was made by the declarant while participating in a conspiracy to commit a crime; second, the statement was made in furtherance of the objective of that conspiracy; and third, the statement was made by the declarant either prior to or during the time the party was participating in the conspiracy. (Evid. Code, § 403; 1 Jefferson, Cal. Evidence Benchbook, *supra*, § 3.5.)

The state of the evidence, at the time the trial court allowed the blackened calendar into evidence as hearsay falling within the Evidence Code section 1223 exception, was clearly somewhat ambiguous. The section 1223 requirement that the coconspirator's statement must further the object of the conspiracy is broadly construed. Courts often rule any statement which relates to the conspiracy to be in furtherance thereof. (See, e.g., *People* v. *Saling* (1972) 7 Cal.3d 844 [103 Cal.Rptr. 698, 500 P.2d 610]; *Salazar* v. *United States* (9th Cir. 1968) 405 F.2d 74.)

Here, the blackened calendar was found in Ford's home some 10 months after the February 23d date. No evidence was presented which directly tied Ford to the act of blackening the date, such as fingerprint or other scientific proof, nor was it shown that he in some way had sole access to the exhibit during the relevant time frame. On the other hand, the trial court was presented with Ford's son's testimony which was presented by the defense in an effort to convince the court that he, not his father, had blackened the date in question. The trial court was in a position to reasonably conclude, and the record reflects, that Ford's son was the subject of considerable impeachment. Further, it appeared that Ford, his wife and his son were the only people who had regular access to the calendar in question. We conclude, based on a complete review of the record, that the trial court reasonably determined that a proper foundation had been laid for the submission of the exhibit to the

jury through section 1223 as against Von Villas, a coconspirator. We recognize that stronger foundations have been presented in support of the admission of such "statements," but conclude that the trial court did not abuse its discretion in admitting the exhibit.

The record also reflects that the trial judge gave wide latitude to both Von Villas and Ford in their efforts to dilute the impact, if any, of the blackened calendar date on the jury. Even if the trial court did err in admitting the exhibit as the admission of a coconspirator pursuant to section 1223, we conclude such error, if any, was harmless. (*People* v. *Watson* (1956) 46 Cal.2d 818 [299 P.2d 243].)

E. *The "Ory" Note*

On December 20, 1983, officers of LAPD conducted a search, pursuant to a search warrant, of the Von Villas home. Mrs. Von Villas was present and had on her person a note which made reference to "Mr. Ory" and contained various other entries which the prosecution determined were incriminatory. The record supports the conclusion that the note was created by Mrs. Von Villas at the direction of Von Villas. The prosecution therefore argued that the note, if it was hearsay, fell within the authorized admission exception. (Evid. Code, § 1222, subd. (b).)[9] To Von Villas's contention that admission of the note would be in violation of Evidence Code section 980, the privilege afforded confidential marital communications, the prosecution successfully argued that even if the communication were considered confidential, it was not protected by the marital privilege because it constituted a plan to conceal evidence and obstruct justice, thus losing its privileged status through the "crime or fraud" exception. (Evid. Code, § 981.)

When the officer executing the search warrant attempted to recover the note from Mrs. Von Villas, she apparently attempted to hide the note. She also stated "Those are notes of my husband." The efforts of Mrs. Von Villas to hide or secrete the notes was found inadmissible by the trial court pursuant to Evidence Code section 352, while her comment admitting that the notes were from her husband was found to be admissible as a spontaneous statement pursuant to Evidence Code section 1240.

Again, respondent argues that the trial court need not have reached the determination that the note was hearsay as the contents of the note ("police

[9]"§ 1222(b). Authorized admission. Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if:

"(a) The statement was made by a person authorized by the party to make a statement or statements for him concerning the subject matter of the statement; and (b) The evidence is offered either after admission of evidence sufficient to sustain a finding of such authority or, in the court's discretion as to the order of proof, subject to the admission of such evidence."

might have your phone number" and "Mr. Ory close friend in jail," inter alia) were not offered to prove the truth of the matter and thus were not hearsay at all. We are asked to determine whether the trial court committed error by admitting the note under the theory before the court at the time; not to readjudicate the issue of admissibility on a new and different theory.

 There was a sufficient record before the trial court to warrant the reasonable conclusion that the contents of the note represented admissions of Von Villas that were properly admissible under Evidence Code section 1220. Further, there was sufficient evidence to allow the court to reasonably conclude that Mrs. Von Villas, the author of the note, was in a position of authority. The information contained therein was thus admissible under Evidence Code section 1222, subdivision (b).

The finding by the trial court that the privilege afforded confidential marital communications did not attach to the note because of the "fraud and crime" exception set forth in Evidence Code section 981 was supported by substantial evidence.

The trial court did not abuse its discretion in admitting the Ory note. There was no error.

F. *The Trial Court's Refusal to Instruct the Jury That It Was Required to Unanimously Agree Upon the Specific Overt Act Committed in Furtherance of Each Conspiracy*

 Ford avers that the trial court erred when it complied with *People* v. *Jones* (1986) 180 Cal.App.3d 509 [225 Cal.Rptr. 697], and refused to instruct the jury to unanimously agree upon the same overt acts committed in furtherance of each conspiracy before finding guilt.[10] This argument is made by analogy to cases that require an instruction directing the jury to agree on the particular act underlying a conviction, when the evidence consists of more than one act upon which the conviction could be based (*People* v. *Diedrich* (1982) 31 Cal.3d 263 [182 Cal.Rptr. 354, 643 P.2d 971]; *People* v. *Moore* (1983) 143 Cal.App.3d 1059 [192 Cal.Rptr. 374]), and where disagreement among the jurors as to an act underlying a conviction is possible. (*People* v. *Diedrich, supra,* 31 Cal.3d at pp. 280-281; *People* v. *Deletto* (1983) 147 Cal.App.3d 458, 471-472 [195 Cal.Rptr. 233], cert. den. 466 U.S. 952 [80 L.Ed.2d 542, 104 S.Ct. 2156]; *People* v. *Crawford* (1982) 131

---

[10]The trial court refused to instruct the jury because of the following portion of the requested instruction: "In order to find the defendant guilty, all the jurors must agree that he committed the same overt act or acts. It is not necessary that the particular act or acts committed so agreed upon be stated in the verdict." (Note that this is essentially a CALJIC No. 17.01 type instruction.)

Cal.App.3d 591, 595-596 [182 Cal.Rptr. 536].) Because commission of an overt act is an essential element of conspiracy (*Feagles* v. *Superior Court* (1970) 11 Cal.App.3d 735, 739 [90 Cal.Rptr. 197]), Ford contends that failure to give a unanimity instruction amounts to error. Thus, Ford argues that the *Jones* decision is "absurd," and consequently the trial court's reliance thereon was misguided.

This argument is incorrect: *Diedrich, Moore, Crawford*, and *Deletto* are cases involving multiple acts constituting the proscribed criminal offense, not multiple alleged overt acts of a conspiracy. An overt act of a conspiracy has been held to be part of the "theory" of the case rather than an actual element of conspiracy (*People* v. *Jones, supra*, 180 Cal.App.3d at 516-517; *People* v. *Cribas* (1991) 231 Cal.App.3d 596, 611 [282 Cal.Rptr. 538], review den.). The authorities cited by Ford entail multiple acts that are the elements of an offense, not multiple "theories" which present a criminal act to the jury. (*People* v. *Diedrich, supra* [multiple acts of bribery]; *People* v. *Moore, supra*, [multiple acts of "drive by" shootings]; *People* v. *Deletto, supra*, [multiple acts of oral copulation]; *People* v. *Crawford, supra*, [multiple acts of possession of a firearm by an ex-felon].) This distinction is significant because it is not necessary to require the jury to agree on one or more of the several theories presented by the prosecution; it is sufficient that each juror is convinced beyond a reasonable doubt that the defendant is guilty of the offense. This rule has been applied in burglary and murder cases. (*People* v. *Failla* (1966) 64 Cal.2d 560, 567 [51 Cal.Rptr. 103, 414 P.2d 39] [burglary]; *People* v. *Nor Woods* (1951) 37 Cal.2d 584, 586 [233 P.2d 897] [theft]; *People* v. *Chavez* (1951) 37 Cal.2d 656, 670-672 [234 P.2d 632] [murder]; *People* v. *Milan* (1973) 9 Cal.3d 185, 195 [107 Cal.Rptr. 68, 507 P.2d 956] [murder].) Hence, the assertion that *Jones* is "absurd" is incorrect because Ford fails to recognize the distinction between an overt act as part of the "theory" of the crime as opposed to an act that constitutes a crime.

In *Jones*, the court specifically held that an unanimity instruction in regard to overt acts was not required: "Inasmuch as the overt act . . . is not an actual element of the crime, it follows that the jury need only be unanimous in finding *an* overt act was done in furtherance of the conspiracy, not in finding a particular overt act was done. . . . Hence, the overt act is part of the 'theory' of the case, not an act constituting the offense." Thus, "a trial court need not instruct the jury [*sic*] they must unanimously agree as to the overt act done in pursuance of a conspiracy." (*People* v. *Jones, supra*, 180 Cal.App.3d at pp. 516-517; *People* v. *Cribas, supra*, 231 Cal.App.3d at p. 611.)

*Jones* teaches that the rationale underlying the overt act requirement stems from evidentiary concerns of the crime of conspiracy. Ford contends that this

rationale is "absurd" because evidentiary concerns would then dictate which elements are to be included in the definition of any crime. Ford fails to recognize the scope of the *Jones* decision. *Jones* simply concerns conspiracy. It is a narrow ruling which deals with a unique crime; consequently, the *Jones* rationale does not pertain to elements of other crimes.

Other cases have maintained in dicta that a specific, separate, unanimity instruction must be submitted to the jury. (*People v. Ramirez* (1987) 189 Cal.App.3d 603, 611-613 [233 Cal.Rptr. 645]; *People v. Brown* (1991) 226 Cal.App.3d 1361, 1369 [277 Cal.Rptr. 309].) The *Ramirez* and *Brown* opinions are based upon the ruling that an overt act is an essential element of a conspiracy (*Feagles v. Superior court, supra,* 11 Cal.App.3d at p. 739), and thus jury unanimity must be assured.

This view fails to recognize the distinction espoused by *Jones*: an overt act is an essential element in that it is the theory which proves a criminal conspiracy, rather than an element in the actual crime of conspiracy. Further, *Ramirez* and *Brown* fail to credit or refute the reasoning behind the *Jones* conclusion. *Jones* states that evaluating an overt act as part of the "theory of a case" is "logical in light of the stated purposes for requiring the overt act: allowing termination of the agreement to avoid punishment and requiring proof of an intent to act on the evil thoughts of the conspirators." Therefore, "the overt act merely establishes the legal existence of a criminal conspiracy," and thus it is " 'the agreement, not the overt act that is punishable.' " (*People v. Jones, supra,* 180 Cal.App.3d at p. 516, italics omitted.)

Lastly, at the time the trial court decided to rely on *Jones*, it was bound to follow the Court of Appeal decision. "Under the doctrine of stare decisis, all tribunals exercising inferior jurisdiction are required to follow decisions of courts exercising superior jurisdiction." (*Auto Equity Sales* v. *Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].) Therefore, the trial court's reliance on *Jones* was not "misplaced," as the appellant contends, but was in fact mandated. Accordingly, there was no error.

G. *The Newspaper Photo of Ford and Von Villas Found in Janie Ogilvie's Desk on December 20, 1983*

1. *Factual Summary*

On December 20, 1983, LAPD officers found a newspaper article dated September 30, 1983, in Jan Ogilvie's desk at the lab. It contained a photograph of Von Villas and Ford huddled together and a handwritten notation

stating, "Jan, hope you are sleeping well" with a handwritten arrow pointing at Von Villas in the picture. The article dealt with the preliminary hearing in the Loguercio case. It was offered by the prosecution during its direct examination of Ms. Ogilvie. Its relevancy, according to the prosecution, was not to show that Von Villas and Ford were conspirators, but rather to show Ms. Ogilvie's state of mind—that is, that her continued possession of the clipping could reasonably be interpreted as a tacit acknowledgement that she was connected to Von Villas and Ford in a matter which smacked of wrongdoing. This became important to the prosecution in light of the defense claim that Ms. Ogilvie had deliberately fabricated the Von Villas and Ford contract to kill Mr. Weed scenario in the interest of deflecting the blame for his death to others in order to escape the harsh punishment she deserved, in their view, for masterminding his death on her own. The prosecution view was that such a claim would be refuted if it could be shown that Ms. Ogilvie continued to keep an incriminatory clipping depicting Von Villas and Ford with her even before she was charged with the murder of Mr. Weed.

The record reflects that the trial court decided to admit certain versions of the clipping after what can best be described as "whipsawing" by counsel.

The prosecution offered to delete the article and only offer the photograph with the arrow and handwritten notation. Ford originally objected to presenting the clipping to his jury because the photo and writing thereon was hearsay and because the article did not appear until after termination of the conspiracy. Von Villas originally did not object to introduction of the photo but objected to the handwritten notation and the arrow and later objected to the photo as well. The trial court first ruled that the photo would be admitted as to Von Villas only, but that the handwritten notation and arrow would be excised from the exhibit. Von Villas then objected to presenting the clipping to the Von Villas jury while the Ford jury was absent because to do so would indicate to the Von Villas jury that "Ford is less guilty than Von Villas." Ford suggested that a cautionary instruction would solve Von Villas's problem. The trial court then changed its ruling, ordering that the clipping, as excised, would be presented to both juries. Ford then requested that the clipping be presented to his jury with the arrow and handwritten notation included but with Ford's face excised. Von Villas objected to this procedure, and the trial court finally ruled that the clipping with the arrow only included would be presented to the Ford jury while the clipping with no arrow or handwritten notation would be presented to the Von Villas jury.

Ms. Ogilvie authenticated the clipping as having been in her desk.

When the trial court reviewed the exhibits for purposes of handling objections to their admissibility at the conclusion of the prosecution case-in-chief, Ford's counsel specifically indicated that he had no objection to the introduction of the clipping with the arrow.

### 2. *The Consequences of Ford's Failure to Object*

Although counsel for Ford originally objected to the introduction of the clipping, it became apparent during the cross examination of Ms. Ogilvie that he believed the clipping would be useful for impeachment purposes. Specifically, counsel for Ford attempted to show that Ms. Ogilvie may have learned of the use of disguises, such as wigs and makeup, by the defendants through her reading of newspaper articles rather than actual contact with them. In fact Ford's counsel elicited the substance of the handwritten notation ("hope you're sleeping well") before the jury and even introduced an enlargement of the headline of the newspaper article in an effort to impeach Ms. Ogilvie's recollection of the disguises used by the defendants.

Ford's tactical decision not to object to the introduction of the clipping as excised constitutes a waiver of the issue on appeal. (Evid. Code, § 353, subd. (a).)

### 3. *The Clipping Was Properly Admitted*

█ Ford's argument in opposition to the admission of the clipping is grounded on a hearsay theory—the clipping is nothing more than an anonymous person's opinion of Ms. Ogilvie's guilt in using the services of Von Villas and Ford to kill Mr. Weed. The prosecution, as indicated above, offered the clipping for a totally different and proper purpose—to rebut the contention that Ms. Ogilvie acted alone in doing away with Mr. Weed. The trial court requested input with respect to limiting instructions that might ease the defendants' concerns about any misuse of the evidence by the jury, but none was forthcoming. (Evid. Code, § 355.)

It should finally be noted that counsel for Ford did use the clipping in cross-examination of Ms. Ogilvie, and, in fact, presented to the jury matters contained thereon which the trial court had excised from the exhibit. Surely any error that the trial court may arguably have committed by admitting the clipping was harmless. (*People* v. *Watson, supra,* 46 Cal.2d 818, 836.)

### H. *The Jury Instruction Concerning Presence or Absence of Motive*

The Ford jury was instructed as follows:

"Motive is not an element of the crime charged and need not be shown. However, you may consider motive or lack of motive as a circumstance in this case. Presence of motive may tend to establish guilt. Absence of motive may tend to establish innocence. You will give its presence or absence, as the case may be, the weight to which you find it to be entitled."

 Ford contends that because there was no evidence presented that directly proved he had a motive to kill Mr. Weed the trial court committed reversible error when it read the motive instruction. Further, because Ford did not present evidence that he was particularly unsusceptible to financial gain, the portion of the instruction dealing with absence of motive as establishing innocence was unnecessary and, indeed, unjustified.

Respondent points out that even if the record provided neither motive nor absence of motive evidence, any error in the giving of the motive instruction was harmless. (*People* v. *Rollo* (1977) 20 Cal.3d 109, 123 [141 Cal.Rptr. 177, 569 P.2d 771].) In fact the jury was instructed to disregard those instructions which applied to a state of facts which the jury determined did not exist.

In *People* v. *Martinez* (1984) 157 Cal.App.3d 660 [203 Cal.Rptr. 833], the court found that the giving of the motive instruction constituted reversible error under the facts of that case. What distinguishes *Martinez* from this case is the fact that the defense in *Martinez* was entrapment, thus there was an admission by the defendant that he in fact did that which was alleged in the charging instrument. Clearly the giving of a motive instruction under those circumstances would have been confusing to the jury and may well have mislead them, as motive was a totally irrelevant issue. In the case at bar the giving of the balanced motive instruction allowed the jury to reach a reasoned inference based on the evidence.

As the *Martinez* court opined:

"Our high court has declared that 'such an error is usually harmless, having little or no effect "other than to add to the bulk of the charge." ' [Citation.] There is ground for concern only when an abstract or irrelevant instruction creates a substantial risk of misleading the jury to the defendant's prejudice. (*Rollo*, *supra*, 20 Cal.3d at p. 123, quoting from *People* v. *Sanchez* (1947) 30 Cal.2d 560, 572 [184 P.2d 673].)" (157 Cal.App.3d at p. 669.)

We find that the giving of the motive instruction did not create a substantial risk of misleading the jury. There was no prejudice caused Ford by its reading. (*People* v. *Rollo*, *supra*, 20 Cal.3d 109, 123.)

### I. *The Jury Instruction Concerning Admissions*

Ford objected to the giving of CALJIC No. 2.71 (1980 rev.) which defines an "admission" and cautions the jury that evidence of an oral admission of a defendant should be viewed with caution.[11]

The trial court, at Ford's request, struck two sentences from the instruction and read the following:

"An admission is a statement made by defendant other than at his trial which does not by itself acknowledge his guilt of the crime(s) for which he is on trial, but which statement tends to prove his guilt when considered with the rest of the evidence.

"You are the exclusive judges as to whether the defendant made an admission, and if so, whether such statement is true in whole or in part.

Evidence of an oral admission of the defendant should be viewed with caution."

▮▮▮ Ford contends that the statements he made during the conversation with his wife of December 20, 1983, were ambiguous and thus the issue as to whether they constituted admissions was crucial to the defense case. He claims that the giving of the admissions instruction misled the jury and created confusion in that it strongly suggested that the statements were admissions as a matter of law. We disagree.

The instruction clearly points out that it was within the exclusive province of the jury to determine whether any statements made by Ford were "admissions". The jury was not railroaded in any way. The trial court did not commit error when it instructed the jury by giving the modified CALJIC No. 2.71.

### J. *Judge Williams's Ruling on the Section 995 Motion After Judge Altman's Tentative Ruling Thereon*

Before the Weed case was severed from the Loguercio case, Judge Altman, originally assigned to preside over the trial, issued a tentative ruling

---

[11]CALJIC No. 2.71 (1980 rev.) reads:

"An admission is a statement made by defendant other than at his trial which does not by itself acknowledge his guilt of the crime(s) for which he is on trial, but which statement tends to prove his guilt when considered with the rest of the evidence.

"You are the exclusive judges as to whether the defendant made an admission, and if so, whether such statement is true in whole or in part. If you should find that the defendant did not make the statement, you must reject it. If you find that it is true in whole or in part, you may consider that part which you find to be true.

"Evidence of an oral admission of the defendant should be viewed with caution."

striking certain overt acts charged in the Weed conspiracy to commit murder count. The overt acts that were stricken included allegations, inter alia, that coconspirators were involved in certain discussions and arrangements internal to the conspiracy. The tentative ruling was made on July 15, 1985, in response to Ford's section 995 motion (hereafter 995 motion). Uncertain as to whether the internal discussions and arrangements among coconspirators could legally constitute overt acts, Judge Altman couched his tentative ruling in the form of alternative and provisional judgments. A stay was granted in order to provide the prosecution an opportunity to file a petition for writ of mandamus or to prepare a memorandum of points and authorities which would more fully set forth the prosecution's legal arguments on the issue. Although Judge Altman was of the view that the internal discussions among coconspirators did not legally constitute overt acts under the conspiracy count, and initially struck them, ordering that the information be amended to reflect one overt act, the killing of Mr. Weed, he did indicate that his assessment of the law may have been incorrect. Thus, he issued two tentative and alternative findings, one reflecting his view of the law, and the other reflecting the prosecution's view of the law; that such discussions did constitute overt acts.

Rather than pursue appellate review of the alternative orders or provide Judge Altman with additional authorities on the matter, the prosecution chose to exercise its peremptory challenge of Judge Altman pursuant to Code of Civil Procedure section 170.6 on July 17, 1985.

Upon transfer of the matter to Judge Williams, who eventually presided over the Loguercio case, Ford and Von Villas urged the court to find that Judge Altman's tentative ruling striking the relevant overt acts in the conspiracy count was a final judgment. Because the prosecution failed to pursue its appellate remedy or present its memorandum of points and authorities in support of its legal argument, counsel for Ford and Von Villas argued, it had waived the benefits of any remedy offered by Judge Altman. The prosecution's conduct, they argued, had rendered Judge Altman's original ruling striking the relevant overt acts a final order.

Judge Williams reconsidered the issues raised in the 995 motion and ruled that the internal discussions and arrangements among coconspirators did legally constitute overt acts.

Ford now claims that Judge Williams's decision to reconsider Judge Altman's earlier alternative ruling on the 995 motion constituted an abuse of discretion and, under the circumstances of this case, a violation of his right to due process of law.

Ford's initial argument is based on *In re Kowalski* (1971) 21 Cal.App.3d 67, 70 [98 Cal.Rptr. 444], wherein the court stated "[o]rdinarily, a motion under section 995 should not be renewed unless changed circumstances are shown which have a significant bearing on the question whether a defendant was indicted or committed without probable cause. (Cf. Code Civ. Proc., § 1008)."

Ford's reliance on *Kowalski* is misplaced. The initial trial judge in that case clearly entered a final judgment granting the relief requested by the defendant when he dismissed the indictment. A different judge was thereafter assigned the case and ruled that the initial judge's ruling granting dismissal of the indictment was beyond his, the initial judge's, jurisdiction. Trial was set on the indictment which had been dismissed. The Court of Appeal correctly ruled that the initial judge's granting of the 995 motion was not reviewable by another trial court judge.

Here the express tentative ruling presented by Judge Altman was not final. Indeed, Judge Altman merely informed the parties of his views on the legal issues presented, set forth the alternative rulings, and presented options for the prosecution to pursue. Because there was clearly no final judgment, Judge Williams was free, legally, to make a final ruling on the 995 motion. *Kowalski* is inapposite.

Next Ford claims that Judge Williams committed error by ruling on the 995 motion because the peremptory challenge under Code of Civil Procedure section 170.6 should never have been allowed in the first place. He argues that because the peremptory challenge was not timely filed, Judge Altman should not have allowed the challenge. Interestingly, counsel for Ford in his opening brief appears to admit the frailty of this argument when he states: "Here, appearances were not flattering. The People eschewed normal procedures for testing an adverse ruling, and chose rather to challenge Judge Altman peremptorily—a procedure that allowed for little or no scrutiny. Judge Altman abided by direct case authority and recused himself in the face of a legally proper challenge." We decline to find error in Judge Altman's response to the peremptory challenge or in Judge Williams's accepting the case after the challenge.

Finally, Ford and Von Villas contend that it was the combination of Judge Williams's modification of Judge Altman's tentative rulings on the 995 motion and the circumstances under which he was assigned the case after the peremptory challenge of Judge Altman that elevates their claim that there was an abuse of discretion on the part of the court to a claim that their rights to due process of law were violated, requiring reversal of their convictions. We disagree.

There is nothing constitutionally irregular in a trial judge reconsidering a tentative ruling of another judge, especially when that other judge expressed some reservation as to his or her understanding of the legal issue which was the subject of the tentative ruling. Judge Williams merely entered a final ruling based upon his interpretation of the law. As to the peremptory challenge, there is no direct challenge of that procedure before this court. To the contrary, as indicated, *ante*, Ford seems to suggest that the challenge was "legally proper" in his opening brief.

Accordingly, we conclude that there was no abuse of discretion below and that the right to fundamental fairness assured Ford and Von Villas by the due process clause of the federal and state Constitution was not violated by Judge Williams in modifying Judge Altman's tentative ruling on the 995 motion.

K. *"Internal Discussions and Arrangements" Can Be Properly Alleged to Be Overt Acts in Furtherance of a Conspiracy*

 Ford contends that the trial court erred when it allowed the prosecution to allege certain actions as overt acts of the conspiracy to commit murder. He asserts that Judge Williams's modification of Judge Altman's tentative rulings involved an incorrect assessment of the law and is, therefore, reversible error.

Judge Williams allowed discussions and arrangements between the coconspirators to be pled as overt acts of the conspiracy.[12] Ford states that these actions constitute the formation of an illegal agreement, not overt acts in

---

[12]The prosecution pled and Judge Williams allowed the following to be included as overt acts in the conspiracy to commit murder count:

1. The meeting between Ogilvie and Reynolds, in which Ogilvie states her desire to have Weed killed.
2. Ogilvie inquires as to whether Von Villas can be trusted.
3. Ogilivie asserts that she had $20,000 to pay for the murder.
4. Reynolds promises to call Von Villas.
5. Reynolds phones Von Villas and states that Ogilvie will pay $20,000 for Weed's murder.
6. Reynolds asks Von Villas if he would kill Weed, and Von Villas answers in the positive.
7. Von Villas requests Weed's description and address.
8. Von Villas requests information regarding dates in which Ogilvie would be out of town, so that Weed could be killed on a day when Ogilvie has an alibi.
9. Von Villas states that he will call Ogilvie and use the name of Mr. Ory.
10. Reynolds informs Von Villas of Ogilvie's home and business number.
11. Reynolds calls Ogilvie and states that Von Villas had her phone number and would be calling under the name of Mr. Ory, seeking information about Weed.
12. Von Villas calls Ogilvie.

furtherance of the agreement. This argument is made in light of the definition of an overt act adopted by the Supreme Court in *People* v. *Zamora* (1976) 18 Cal.3d 538, 549, footnote 8 [134 Cal.Rptr. 784, 557 P.2d 75]: "[A]n outward act done in pursuance of the crime and in manifestation of an intent or design, looking toward the accomplishment of the crime. (*Chavez* v. *United States* (9th Cir. 1960) 275 F.2d 813, 817.)" Ford asserts that all overt acts alleged by the prosecution are "internal plans, agreements, and arrangements of the conspirators," and in this capacity are not "outward" actions done in pursuance, but rather acts done in creating a conspiracy.

Ford contends that "internal discussions and arrangements" of coconspirators cannot possibly constitute overt acts of a conspiracy. He claims that an "overt act cannot occur until the agreement is firm and no longer tentative, and extends outward from the intraconspiratorial arrangements into action toward the agreed upon goal." In simple terms, Ford argues (through inference from the *Zamora* definition) that any discussions and arrangements between conspirators done in preparation of a criminal act cannot be an overt act. Essentially, appellant urges this court to rule that an overt act must constitute a decisive step, by one conspirator, toward the commission of the crime. This position lacks merit.

It is well settled that at common law the offense of conspiracy was complete when the unlawful agreement was made; no overt act in furtherance of such conspiracy needed to be alleged or proved. (*Landgringham* v. *State* (1874) 49 Ind. 186, 188; *State* v. *Ripley* (1850) 31 Me. 386; *Commonwealth* v. *Warren* (1809) 6 Mass. 74; *Commonwealth* v. *Judd* (1807) 2 Mass. 329; *People* v. *Richards* (1849) 1 Mich. 216.) In California, however, section 184 requires an overt act be done in furtherance of the object of the conspiracy before the offense is complete. (*People* v. *Olson* (1965) 232 Cal.App.2d 480, 490 [42 Cal.Rptr. 760]; *People* v. *Daniels* (1894) 105 Cal. 262, 264 [38 P. 720].)

As noted, "an outward act done in pursuance of the crime and in manifestation of an intent or design, looking toward the accomplishment of

---

13. Von Villas requests Weed's photograph, description, address, phone number, automobile license number, and daily routine.

14. Von Villas states to Ogilvie that Weed would disappear and not be found, and that the job could be accomplished while she was away in Dallas.

15. Von Villas states that an out-of-town professional, named "Dickie" would contact her.

16. Ogilvie gives Von Villas the information sought in overt act No. 13.

17. Von Villas tells Ogilvie that he will call back with a price after determining the difficulty of the job.

18. Von Villas calls back, states the price and the manner of payment.

19. Ogilvie deposits $7,500 in a car at a gas station in the San Fernando Valley.

20. Ogilvie deposits another $5,000 in a different car and gas station.

21. Von Villas calls and acknowledges payment and states, "I'll let you know when it has been taken care of."

the crime" is an overt act. (*People* v. *Zamora, supra,* 18 Cal.3d at p. 549, fn. 8.) This act need not "constitute the crime or even an attempt to commit the crime which is the conspiracy's ultimate object. Nor is it required that such a step or act, in and of itself, be a criminal or unlawful act." (*People* v. *Profit* (1986) 183 Cal.App.3d 849, 882 [229 Cal.Rptr. 148]; accord, *People* v. *McKinney* (1963) 218 Cal.App.2d 174, 177 [32 Cal.Rptr. 175] [an overt act need not amount to an attempt to commit the offense or to aiding and abetting].) "The requirement of an overt act before the conspirators can be prosecuted and punished exists . . . , to provide a *locus p*[*o*]*enitentiae*—an opportunity for the conspirators to reconsider, terminate the agreement, and thereby avoid punishment for the conspiracy." (*People* v. *Zamora, supra,* 18 Cal.3d at p. 549, fn. 8; see *People* v. *Olson, supra,* 232 Cal.App.2d 480, 490; *People* v. *Crosby* (1962) 58 Cal.2d 713, 728 [25 Cal.Rptr. 847, 375 P.2d 839].)

 Ford asks this court to consider how far this overt act must go in furtherance of the illegal design before the crime is complete. He suggests discussions and arrangements among conspirators are not overt acts, but part of the inception of the criminal agreement. Therefore, an overt act can only occur after a "complete plan" has been decided upon. This reasoning is incorrect, because it does not take into account the nature of "the agreement" in a criminal conspiracy.

The punishable act, or the very crux, of a criminal conspiracy is the evil or corrupt agreement. (*People* v. *Marsh* (1962) 58 Cal.2d 732, 743 [26 Cal.Rptr. 300, 376 P.2d 300]; *People* v. *Aday* (1964) 226 Cal.App.2d 520, 523 [38 Cal.Rptr. 199].) This agreement is not a tangible occurrence: the specific time when a common illegal design comes into existence cannot, in most instances, be identified. For this reason an agreement is a continuous act; thus conspiracy is said to be a continuing crime. (*People* v. *Hess* (1951) 104 Cal.App.2d 642, 678 [234 P.2d 65].) With this in view, we decline to hold that an overt act can only be committed after a complete agreement is formed, because an agreement is continuous. Thus, once a punishable agreement is formed, internal discussions and arrangements between coconspirators can easily constitute overt acts in furtherance of the conspiracy. (See, e.g., *People* v. *Sconce* (1991) 228 Cal.App.3d 693 [279 Cal.Rptr. 59] (alleged overt acts consisted of defendant's pointing out the intended victim to a coconspirator, coconspirator's solicitation of another conspirator, and defendant's inquiries of one coconspirator to "to take care of and kill" the victim.)

To properly analyze this issue we simply look to whether the acts are "outward act[s] done in pursuance of the crime and in manifestation of an intent or design, looking toward the accomplishment of the crime." (*People*

v. *Zamora, supra,* 18 Cal.3d at p. 549, fn. 8.) "Outward" refers to any tangible acts that manifest a criminal intention. If the conspirators partake, among themselves, in arrangements, discussions, and preparation in regard to and for the criminal act, then they have ventured beyond a mere criminal intention and forgone the opportunity afforded them by the overt act requirement: "to reconsider, terminate the agreement, and thereby avoid punishment for the conspiracy." (*Ibid.*) Such discussions and arrangements among conspirators can, therefore, constitute properly chargeable overt acts in a criminal conspiracy prosecution.

In this case, Judge Williams did not err by allowing the prosecution to allege discussions and arrangements between the coconspirators as overt acts of a conspiracy. The solicitation of additional conspirators (overt acts two, four, and five), requests for information regarding the victim and the plan to kill Mr. Weed in general (overt acts seven, eight, thirteen, and fourteen), payments to secure a coconspirator's assent to the conspiracy (overt acts three, and eighteen through twenty), and numerous phone conversations laying out the manner in which the conspiracy would be carried out, all look toward the accomplishment of and manifest an intent to commit the crime.

Ford also argues that "allowing these allegations to stand as overt acts also had a prejudicial affect on the outcome of the murder case itself." Because we conclude the trial judge's order allowing the internal discussions and arrangements to be alleged as overt acts was proper, we need not determine whether the allegations had a prejudicial impact on the murder case itself.

L. *The Trial Court's Decision Not to Instruct the Jury to Determine Whether Each Defendant, Individually, Was a Member of the Charged Conspiracy (CALJIC No. 6.22)*

Von Villas contends that the trial court erred because it failed to instruct the jury that it must determine whether each defendant, individually, was a member of a charged conspiracy. (CALJIC No. 6.22.)[13]

He argues that the lower court had a duty, sua sponte, to give the instruction pursuant to *People v. Crain* (1951) 102 Cal.App.2d 566 [228 P.2d 307]. *Crain* held that CALJIC No. 6.22 must be given, sua sponte, in cases where more than one defendant is charged with conspiracy. (102 Cal.App.2d at pp. 581-582.) This requirement ensures against the inherent risk of

---

[13]CALJIC No. 6.22 provides:

"Each defendant in this case is individually entitled to, and must receive, your determination whether [he] [she] was a member of the alleged conspiracy. As to each defendant you must determine whether [he] [she] was a conspirator by deciding whether [he] [she] willfully, intentionally and knowingly joined with any other or others in the alleged conspiracy."

prejudice when multiple defendants are jointly tried in a single conspiracy charge.[14] Von Villas's argument lacks merit.

Von Villas's reliance on *Crain, supra,* is erroneous. *Crain* applies only to cases where a single jury determines the guilt of a number of defendants. In this case two separate juries were impaneled, one for each defendant, to determine the guilt of the jointly tried defendants.

Separate juries afford protection to a defendant when extrajudicial statements or other evidence might cause undue prejudice to a jointly tried codefendant. (*People* v. *Harris* (1989) 47 Cal.3d 1047, 1070-1072 [255 Cal.Rptr. 352, 767 P.2d 619]; *People* v. *Wardlow* (1981) 118 Cal.App.3d 375, 382-387 [173 Cal.Rptr. 500].) Thus, use of dual juries alleviates the inherent risks of prejudice arising in single jury, multiple defendant cases. Hence, Von Villas's contention that he was prejudiced by the failure to submit CALJIC No. 6.22 lacks merit. The use of dual juries fulfills the underlying rationale which made CALJIC No. 6.22 a required instruction in multiple defendant cases. A trial court, therefore, is not necessarily required to instruct the jury with CALJIC No. 6.22 in multiple-defendant, multiple-jury cases involving conspiracy.

In support of his argument Von Villas points to specific instances where his jury was allowed to view evidence relating only to Ford's prosecution. He states that these instances did in fact prejudice his defense, and thus the failure to read CALJIC No. 6.22 was error. Von Villas's argument is inapposite. If evidence was improperly presented to the Von Villas jury, Von Villas's remedy was to request a limiting instruction at the appropriate point in the trial. Such incidents, even if they did occur, would not impose a sua sponte duty upon the trial judge to instruct with CALJIC No. 6.22.

Accordingly, there was no error when the trial court failed to instruct the jury, sua sponte, to determine whether each defendant was individually a member of the alleged conspiracy.

M. *The Sufficiency of the Evidence Against Von Villas and Ford*

 Von Villas claims that the evidence is insufficient to sustain his conviction and that this lack of evidence rises to the level of constitutional insufficiency. Ford joins generally in Von Villas's claim by reference and

---

[14]This risk is described in *Castro* v. *Superior Court* (1970) 9 Cal.App.3d 675, 692 [88 Cal.Rptr. 500] as:

"The psychological reality that in a trial against a number of conspirators, a weak case against one defendant will be strengthened by a mass of evidence relevant only to his codefendants."

without analysis of any specific assertions in support of his insufficiency claim. A review of the entire record convinces us that there was sufficient evidence to support the convictions of both Von Villas and Ford.

Von Villas bases his insufficiency claim on the theory that in most "circumstantial-evidence-of-corpus-delicti cases" the circumstantial proof of the murder pointed to a spouse or to someone closely connected by evidence to the victim. (*People* v. *Ruiz* (1988) 44 Cal.3d 589 [244 Cal.Rptr. 200, 749 P.2d 854]; *People* v. *Scott* (1969) 274 Cal.App.2d 905 [79 Cal.Rptr. 587]; *People* v. *Scott* (1959) 176 Cal.App. 2d 458 [1 Cal.Rptr. 600]; *People* v. *Bolinski* (1968) 260 Cal.App.2d 705 [67 Cal.Rptr. 347].) His argument is that all of the circumstantial evidence of the corpus delicti in the instant case points to Ms. Ogilvie, and not Von Villas, as the guilty party. We disagree.

In passing upon a claim of insufficiency of the evidence, an appellate court must "review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People* v. *Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].)

The California Supreme Court has held that regardless of whether the evidence presented during the trial is principally circumstantial as opposed to direct, the standard of review is no different.

"[E]ven though the appellate court may itself believe that the circumstantial evidence might be reasonably reconciled with defendant's innocence, this alone does not warrant interference with the determination of the trier of fact. [Citations.] Whether the evidence presented is direct or circumstantial, . . . the relevant inquiry on appeal remains whether *any* reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt. [Citations.]" (*People* v. *Towler* (1982) 31 Cal.3d 105, 118-119 [181 Cal.Rptr. 391, 641 P.2d 1253].)

A complete review of the entire record below convinces us not only that Mr. Weed had been murdered, but also that a reasonable trier of fact could have found Von Villas and Ford guilty as charged beyond a reasonable doubt.

Ms. Ogilvie testified that she paid Von Villas to kill Mr. Weed. Von Villas use the name "Mr. Ory" as an obvious alias to avoid detection. The real Mr.

Ory had been a personal friend of Von Villas but had not talked with him for years. "Mr. Ory" told Ms. Ogilvie that she owed him $7,500, which statement, under the circumstances, clearly was a message to her that the deed of killing Mr. Weed had been accomplished. The facts and circumstances surrounding Mr. Weed's disappearance, including the condition of his apartment, his abandoned car and the total cessation of his normal daily activities, provided ample evidence from which the trier of fact could infer that his disappearance was involuntary. Combined with the other evidence of the Von Villas and Ford conduct in dealing with Ms. Ogilvie, there was substantial evidence from which the jury could reasonably infer that Mr. Weed was murdered. Ms. Reynolds's testimony indicated that she asked Von Villas whether he had taken care of Ms. Ogilvie's problems. His response was "the only thing that I can tell you is that there's a lot of space between here and Las Vegas and that Julie doesn't have to worry about Tom Weed anymore." He also told her that Mr. Weed was dead. The testimony of Ms. Ogilvie about the money drops corroborated other evidence that implicated Von Villas, as the description of the first car into which the money was placed was similar to the Von Villas car. Further, the discovery of a savings account deposit ticket with the name "Jan Ogilvie", the words "ROS" and "RES" reflecting the location of the drop, Ms. Ogilvie's telephone number, and the number "6", in Von Villas's car also corroborated her testimony. The first money drop, according to Ms. Ogilvie, occurred at approximately 6 p.m. at Roscoe and Reseda Boulevards. Additionally, the telephone toll records generated by Von Villas's home telephone reflect that a call was placed from that number to Ms. Ogilvie's lab at 5:15 p.m. on February 22, 1983. Motive evidence was provided by the testimony of Ms. Reynolds and Ms. West that Von Villas was in search of opportunities to kill in order to make money.

As to Ford, Ms. Ogilvie's testimony concerning the appearance of both defendants at her home together and the obvious discussions in Ford's presence concerning the plans to kill Mr. Weed was substantial evidence of Ford's involvement in the plan. The use of disguises by both Ford and Von Villas, including wigs and makeup which were later found in Ford's residence, during their meeting with Ms. Ogilvie was presented to the jury. Also found in the Ford residence was a calendar with the February 23, 1983, date, the date of Mr. Weed's disappearance, totally blackened out. In addition, the tape recording of the December 20, 1983, discussion between Ford and his wife contained many incriminating statements which reflected Ford's knowledge of and participation in the murder of Mr. Weed.

In conclusion, we find that the evidence was sufficient to sustain the convictions of both Von Villas and Ford on both the conspiracy and substantive murder counts. A reasonable trier of fact could have found each defend-

ant guilty beyond a reasonable doubt. (*People* v. *Towler, supra,* 31 Cal.3d 105.)

N. *The Appellants' Claim That What Would Ordinarily Be Considered Harmless Error Was Transformed to Prejudicial Error Because This Was a "Close Case"*

Citing *People* v. *Zemavasky* (1942) 20 Cal.2d 56 [123 P.2d 478], for the proposition that in a close case any error may be considered prejudicial that would not ordinarily be so regarded, Von Villas claims first, that this was a close case and, second, any errors committed by the trial court should thus be considered reversible error although they ordinarily would be considered merely harmless error. Initially, it must be stressed that the *Zemavasky* court held:

"An appellate court is not only permitted to, but must, consider the state of the evidence in determining whether errors are prejudicial. In a close case, such as this, any error of a substantial nature may require a reversal and any doubt as to its prejudicial character should be resolved in favor of the appellant." (*Id.* at p. 62.)

Thus the court was concerned about "substantial" error as opposed to "any error" in its analysis of prejudicial error in close cases. Further, *Zemavasky* was indeed a unique prosecution involving major allegations of prosecutorial misconduct and the presentation of incredible witnesses in a statutory rape prosecution. In fact the Attorney General submitted the case without argument after presenting a brief to the District Court of Appeal which served to accentuate the appellant's claims. The Deputy Attorney General stated that " 'it appears that the evidence against appellant was not overly credible.' " (20 Cal.2d at p. 58.)

A review of the entire record convinces us that this case is not a "close case." We have found that there was sufficient evidence to support the convictions of both Von Villas and Ford, and in reaffirming that finding, we also conclude that because this is not a "close case" the doctrine that what would otherwise be harmless error became prejudicial error is inapposite.

O. *Von Villas's Statements to Ms. West and Ms. Reynolds Reflecting His Willingness to Commit Contract Killings*

Over defense objection, the trial court admitted testimony of two women who witnessed Von Villas express a desire to commit criminal acts for money. Ms. Gayl West testified that in the early part of 1983 Von Villas told

her that if she knew anyone who wanted "a contract" put on anybody, she should let him know and they would both make a commission. Ms. Joyce Reynolds testified that on December 9, 1982, Von Villas told her "that he was tired of being an honest cop" and that there was no job he would not do for money, including murder. The trial court admitted this evidence pursuant to Evidence Code sections 1101, subdivision (b) and 1250.

Von Villas contends that admission of their testimony was error because it was offered to demonstrate criminal propensity rather than a material fact in issue. At trial the prosecution argued that the evidence was presented to show Von Villas's intent. Von Villas countered by asserting that identity, not intent, was the sole relevant issue, and that the proffered testimony could only be used by the jury to prove his bad character. We agree that identity was the crucial relevant issue, but conclude that the claim that the testimony does not prove a relevant material fact is without merit.

"Where the purpose of introducing evidence of other crimes is not to show bad character but to establish some other fact in issue, the limited admissibility doctrine allows its admission for that particular purpose." (*People* v. *Douglas* (1990) 50 Cal.3d 468, 510 [268 Cal.Rptr. 126, 788 P.2d 640]; *People* v. *Powell* (1974) 40 Cal.App.3d 107, 154 [115 Cal.Rptr. 109]; *People* v. *Phillips* (1960) 186 Cal.App.2d 231, 245 [8 Cal.Rptr. 830].) Evidence Code section 1101, subdivision (b) states the exception as follows: "Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity . . .) other than his or her disposition to commit such an act."

The testimony was clearly relevant as proof of the identity of the culprit in this case, and thus fell within the ambit of section 1101, subdivision (b). This case involved a woman (Ms. Ogilvie) who paid someone a large sum of money to kill her husband. Von Villas, according to the testimony at issue, solicited others to let him know if anyone wanted to pay him to kill. These offers were expressed within weeks of Mr. Weed's disappearance. The testimony, therefore, was properly admitted to prove identity because the suspect was a person who expressed a desire to kill for money.

The statements were also admissible under Evidence Code section 1250 as a statement of Von Villas's then existing state of mind; a state of mind that is relevant to the crime charged. The crime alleged was a "contract killing." Von Villas expressed his desire to commit such a crime. The statements, therefore, were admissible on that relevant issue.

Even if the court's admission of these statements was in error, the overwhelming evidence amassed by the prosecution against Von Villas would render any such error harmless. Error of this nature results in a miscarriage of justice and is thus reversible error when the court is of the opinion that it is reasonably probable that a result more favorable to the appealing party would have been reached in absence of the error. (Cal. Const., art. VI, § 13; *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) No such error occurred here.

### P. *The Alleged Misconduct of Jurors Cornick and Brown*

#### 1. *Introduction*

After the return of the Von Villas verdict, the trial judge granted his request to interview jurors. Several jurors were interviewed by Mr. Boykoff, Von Villas's investigator, and his trial counsel. Two jurors, Ms. Cornick and Ms. Brown, made certain statements during the interviews which Von Villas claims reveal jury misconduct which requires that his conviction be reversed. Each juror's statement will be analyzed seriatim.

#### 2. *Juror Cornick's Statement*

In his motion for new trial filed on February 23, 1989, Mr. Feinberg, one of Von Villas's counsel, presented his declaration made under penalty of perjury that Ms. Cornick told Mr. Boykoff, inter alia, that during deliberations at the guilt phase the jurors knew about the jewelry store robbery and discussed it. She said the convictions of the defendants for that offense were reported in the Los Angeles Times and that some of the details were mentioned in the article. She also knew about Ford's conviction for murder right after the Ford jury announced its verdict, since she had heard about it on radio or television. She said the jurors talked about the conviction in the jury room.

A declaration containing the foregoing was prepared from notes taken by Mr. Boykoff at the interview for Ms. Cornick's signature but was not signed.[15] Counsel for Von Villas stated that Ms. Cornick categorically denied that she told Mr. Boykoff any of the things contained in the unsigned

---

[15]The unsigned declaration states:

"I, BETTY CORNICK, say:

"I was a juror in the trial of The People of the State of California vs. Robert Anthony Von Villas.

"I was aware that defendant was convicted for robbery [*sic*] a jewelry store before the penalty trial. One or more of the jurors had read about that crime and learned about the conviction from an article in the Los Angeles Times. The jurors discussed it during deliber-

declaration. Ms. Cornick was present at the hearing on the motion for new trial but, at the suggestion of the prosecutor, and with the advice of appointed counsel, invoked her Fifth Amendment privilege against self-incrimination. In making an offer of proof as to what she would have testified to, counsel for Von Villas entered into a stipulation with the prosecution that the Cornick unsigned declaration would be admitted for the purpose of showing what Mr. Boykoff would testify Ms. Cornick told him during the interview. The stipulation was accepted by the court. In addition to Ms. Cornick's comments about the juror's knowledge of Von Villas's robbery conviction and Ford's murder conviction, Boykoff's testimony also indicated that Ms. Cornick told him that when the jury was polled *en masse* by the court before the guilt phase as to whether they knew more about the case than had been presented to them before the trial, the jurors denied such knowledge, and that that denial was untrue.

### 3. *Juror Brown's Statement*

On January 21, 1989, Messrs. Feinberg and Boykoff interviewed Juror Kathryn Brown at her office. She apparently told them that she had a conversation with another juror, Ms. Kitchen, during the guilt phase of Von Villas's trial, in the courthouse cafeteria. During that chat Ms. Brown asked Ms. Kitchen, "Where do you suppose a police officer would have gotten that many diamonds?" Ms. Kitchen replied, "Probably from the jewelry store robbery." There was no express statement as to which jewelry store was robbed or that Von Villas and Ford were convicted of such a robbery.

Ms. Brown was present at the hearing on the motion for new trial and, as with Ms. Cornick, invoked her Fifth Amendment privilege against self-incrimination. This was done after the prosecution suggested that both jurors may, by testifying, be exposed to a perjury prosecution or, at the least, a finding that they were in contempt of court for violating the court's orders.

---

ations. One of the jurors, Ron Rudy, advised them they were not supposed to read about the case in the newspaper.

"I was aware that defendant Ford was convicted by his jury for murder right after it happened. I heard it on radio and saw it on television. The next day all of the jurors knew about it. Ford's conviction was discussed in the jury room. When I heard that Ford was convicted, I thought that defendant Von Villas must be guilty too.

"Jurors discussed what must have happened to Thomas Weed that led to his death. Jurors talked about Weed being forced to dig his own grave in the desert and the defendants burying him in it. Other jurors talked about Weed being dumped into a mining shaft. I heard these discussions in the jury room.

"I declare under penalty of perjury that the foregoing is true and correct.

"Executed this _____ day of February, 1989, at Sherman Oaks, California.

"_____

"Betty Cornick"

Appointed counsel invoked the privilege on behalf of Ms. Brown. Mr. Boykoff then was allowed to testify to his recollection of Ms. Brown's comments made at her office on January 21, 1989, as an offer of proof. After Mr. Boykoff completed his testimony, counsel for Ms. Brown attempted to introduce into evidence a declaration that Ms. Brown apparently created after hearing Mr. Boykoff testify which indicated that Ms. Kitchen in fact did identify the jewelry store that was robbed as Schaffer & Sons. The trial judge rejected the declaration because its reliability was in question since Ms. Brown had been exposed to the testimony of Mr. Boykoff, thus placing her credibility in question.

### 4. The Prosecutor's Analysis of the Misconduct Issue and the Trial Judge's Ruling

At the hearing on the motion for new trial the prosecutor convinced the trial judge that it would be appropriate for both Ms. Cornick and Ms. Brown to invoke their privilege against self-incrimination. Because Ms. Cornick denied making the statements attributed to her in the unsigned affidavit prepared by Mr. Boykoff, and because she confirmed in open court when the sworn jury was asked *en masse* on two occasions whether they, the jury, had considered anything other than that which was presented in court during the trial, that she had not, there was no evidence of jury misconduct. Thus, Ms. Cornick's and Ms. Brown's invocation of their privilege against self-incrimination left nothing before the court in the way of admissible evidence from which it could conclude that jury misconduct had occurred.

Neither the prosecution nor the court, when requested, offered to consider a grant of immunity to either juror.

The prosecutor, relying on the state of the evidence at the conclusion of Mr. Boykoff's testimony, produced no evidence to either disprove the allegation of jury misconduct or to prove that if there was misconduct, it caused no prejudice to Von Villas.

The trial judge denied the motion for new trial filed by Von Villas, stating, "I have not had any evidence that the knowledge that the jurors had that Von Villas had been involved in the robbery effected [*sic*] the finding of their guilt. . . . I simply don't have that evidence that what transpired in the jury room or in the conversation between Kitchen and Miss Brown effected [*sic*] the outcome of the case. That seems to be the very important missing link." The trial judge concluded, "So I do have insufficient evidence to find that the defense has met the burden that there was absolute juror misconduct that would prejudice the defendant."

5. *Von Villas's Assertion That the Statements of Ms. Cornick and Ms. Brown Constitute Declarations Against Interest and Are Thus Sufficient to Raise the Jury Misconduct Issue*

 Von Villas charges that the jurors knew about and improperly discussed among themselves two pieces of information; first, Von Villas's robbery conviction in an earlier prosecution and, second, the fact that a separate jury convicted Ford of murder prior to the Von Villas jury returning its own verdict against Von Villas. The Von Villas robbery conviction had never been presented as evidence to his jury in any way. In fact, that conviction was the principle consideration of Von Villas when he decided not to testify in the Weed murder case. Further, the fact that the jurors learned of Ford's conviction by his separate jury also was receipt of evidence other than that which was presented at trial.

The admissible evidence which supports these charges was presented to the trial judge in the form of the declarations against interest of Ms. Cornick (the unsigned declaration prepared by Mr. Boykoff which was stipulated into evidence) and of Ms. Brown (the testimony of Mr. Boykoff as to their conversation of Jan. 21, 1989). (Evid. Code, § 1230.)[16]

Both jurors had become unavailable, a prerequisite to the operation of section 1230, through their invocation of the Fifth Amendment privilege against self-incrimination. (Evid. Code, § 240, subd. (a)(1).) Both jurors were subject to prosecution for violation of their oaths as jurors by disobeying the orders of the trial judge in contempt proceedings as well as for perjury by criminal prosecution. Both jurors were also exposed to the risk of civil liability and of being made objects of ridicule and social disgrace in the community. In short, asserts Von Villas, a reasonable person in the position of these jurors would not have made the statements unless they believed them to be true.

Finally, Von Villas argues that the prosecution should be estopped from asserting the inadmissibility of secondary evidence (the declarations against interest) since it was the prosecutor's suggestion that the jurors could be

---

[16]The section provides: "Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, was so far contrary to the declarant's pecuniary or proprietary interest, or so far subjected him to the risk of civil or criminal liability, or so far tended to render invalid a claim by him against another, or created such a risk of making him an object of hatred, ridicule, or social disgrace in the community, that a reasonable man in his position would not have made the statement unless he believed it to be true."

prosecuted or held in contempt and thus should have appointed counsel present to advise them of their precarious legal positions.[17]

Once the declarations against interest were before the court, they provided sufficient evidence to raise a presumption of prejudice. (*People v. Pierce* (1979) 24 Cal.3d 199, 207 [155 Cal.Rptr. 657, 595 P.2d 91].) ▮▮▮▮ Such a presumption of prejudice arises from any juror misconduct. (*People v. Honeycutt* (1977) 20 Cal.3d 150, 156 [141 Cal.Rptr. 698, 570 P.2d 1050].) Unless the prosecution can rebut this presumption by proving that no prejudice actually resulted, the defendant is entitled to a new trial. (*People v. Pierce, supra,* 24 Cal.3d at p. 207.)

### 6. *The Law Regarding Jury Misconduct*

▮▮▮▮ When a party seeks a new trial based upon jury misconduct, a court must undertake a three-step inquiry. The court must first determine whether the affidavits supporting the motion are admissible under Evidence Code section 1150, subdivision (a).[18] If the evidence is admissible, the court must then consider whether the facts establish misconduct. (*Krouse v. Graham* (1977) 19 Cal.3d 59, 79-82 [137 Cal.Rptr. 863, 562 P.2d 1022].) Finally, assuming misconduct, the court must determine whether the misconduct was prejudicial. (*People v. Marshall* (1990) 50 Cal.3d 907, 949 [269 Cal.Rptr. 269, 790 P.2d 676]; *People v. Miranda* (1987) 44 Cal.3d 57, 117 [241 Cal.Rptr. 594, 744 P.2d 1127].) A trial court has broad discretion in ruling on each of these questions and its rulings will not be disturbed absent a clear abuse of discretion. (*People v. Montgomery* (1976) 61 Cal.App.3d 718, 728-729 [132 Cal.Rptr. 558].)

▮▮▮▮ It is also well settled that evidence obtained by jurors from sources other than in court is misconduct and constitutes grounds for a new trial if the defendant has been prejudiced thereby. (*People v. Wong Loung* (1911) 159 Cal. 520, 525-529 [114 P. 829].) The misconduct creates a presumption of prejudice which may be rebutted by a showing that no prejudice actually

[17]"Mr. Felker: I have only one concern about this and that is if a juror has indicated in the box under oath, I trust, that they didn't do something and they are now going to be called to admit that they did, that juror may be placing herself or himself in jeopardy of being filed on for perjury. . . . The Court: Well, I am concerned with a juror placing themselves where they could be subjected to perjury or certainly contempt of court."

[18]Section 1150, subdivision (a) provides: "(a) Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. No evidence is admissible to show the effect of such statement, conduct condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined."

occurred. (*People* v. *Marshall, supra*, 50 Cal.3d 907, 949, cert. den., (1991) __ U.S. __ [112 L.Ed.2d 1105, 111 S.Ct. 1023]; *People* v. *Honeycutt, supra*, 20 Cal.3d at p. 156; *In re Winchester* (1960) 53 Cal.2d 528, 535 [2 Cal.Rptr. 296, 348 P.2d 904].) It may also be rebutted " '. . . by a reviewing court's examination of the entire record to determine whether there is a reasonable probability of actual harm to the complaining party. . . .' " (*People* v. *Miranda, supra*, 44 Cal.3d 57, 117.) Indeed, in *People* v. *Marshall, supra*, 50 Cal.3d 907, the court stated:

" 'The ultimate issue of influence on the juror is resolved by reference to the substantial likelihood test, an objective standard. In effect, the court must examine the extrajudicial material and then judge whether it is inherently likely to have influenced the juror.' " (*Id.* at p. 951.)

 Jury misconduct is not reversible error per se. The opportunity for the prosecution to rebut the presumption arises after a showing of misconduct has been made. When the jury misconduct is based on the jurors receiving evidence outside of court, the test for determining whether the defendant has been injured as a result is as follows: "whether the jury's impartiality was adversely affected, whether the prosecution's burden of proof has been lightened and whether any asserted defense has been contradicted. If the answer to any of these questions is in the affirmative, the defendant has been prejudiced and the conviction must be reversed." (See *People* v. *Sutter* (1982) 134 Cal.App.3d 806, 820 [184 Cal.Rptr. 829] citing *People* v. *Martinez* (1978) 82 Cal.App.3d 1, 22 [147 Cal.Rptr. 208].)

 However, the prosecution can utilize the entire record to rebut this presumption. As Justice Mosk stated in *Hasson* v. *Ford Motor Co.* (1982) 32 Cal.3d 388 at page 417 [185 Cal.Rptr. 654, 650 P.2d 1171]:

"[T]he presumption is not conclusive; it may be rebutted by an affirmative evidentiary showing that prejudice does not exist or by a reviewing court's examination of the entire record to determine whether there is a reasonable probability of actual harm to the complaining party resulting from the misconduct. [Citations.] Some of the factors to be considered when determining whether the presumption is rebutted are the strength of the evidence that misconduct occurred, the nature and seriousness of the misconduct, and the probability that actual prejudice may have ensued."

The standard now utilized by California courts to determine whether the presumption of prejudice has been rebutted has been set forth in the American Bar Association Standards for Criminal Justice. "A verdict of guilty must be reversed or vacated 'whenever . . . the court finds a substantial

likelihood that the vote of one or more jurors was influenced by exposure to prejudicial matter relating to the defendant or to the case itself that was not part of the trial record on which the case was submitted to the jury.' (2 ABA Standards for Criminal Justice, std. 8-3.7 (2d ed. 1980) p. 8.57.)" (*People* v. *Holloway* (1990) 50 Cal.3d 1098, 1109 [269 Cal.Rptr. 530, 790 P.2d 1327].) ▮ The analysis utilized in rebutting the presumption of prejudice is "different from and indeed less tolerant than the 'harmless-error-analysis' for ordinary error at trial." (*Id.* at p. 1110.) The reason for the stringent standard is that when even one juror is impermissibly influenced to the defendant's detriment, the integrity of the trial and the impartiality of the jury is undermined. (*People* v. *Marshall*, *supra*, 50 Cal.3d at p. 951.)

### 7. Conclusion

▮ The record reflects a series of errors on all sides which brought about an untenable situation for the trial judge who, in turn, committed error by applying an incorrect legal analysis to the jury misconduct issue. By stating that "I have not had any evidence that the knowledge that the jurors had that Von Villas had been involved in the robbery effected [*sic*] the finding of their guilt," the trial judge indicated that it was her belief that misconduct had occurred. If so, the prosecution would be required to rebut the presumption of prejudice in order to avoid an adverse ruling on the motion for new trial. (*People* v. *Marshall*, *supra*, 50 Cal.3d 907.)

The prosecutor's efforts to in some way preclude examination of the jurors by suggesting that his office might file perjury charges against them if they testified in accordance with their earlier statements to the defendant's investigator were ill-advised at best. Compounding that error in judgment, the prosecutor, after voicing his objections to the admissibility of Ms. Cornick's unsigned declaration and Mr. Boykoff's recollection of that which Ms. Brown told him as hearsay, inexplicably agreed by stipulation that the unsigned declaration and testimony of Von Villas's investigator would be admissible as evidence of what the defense team heard the jurors say.

Von Villas's counsel, after agreeing to the stipulation, never posited to the court a legal theory supporting the admissibility of the unsigned declaration and testimony of Mr. Boykoff as declarations against interest. That theory of admissibility was first raised on appeal, much too late for the trial judge to determine whether the unsigned declaration and testimony carried with them the aura of reliability afforded statements that, in fact, constitute declarations against interest. Of course, the court was foreclosed from making such a determination because counsel for both sides stipulated that the unsigned declaration and investigator's testimony as to Ms. Brown's statements were

admissible. Notably, the prosecution never stipulated that the admitted evidence was in fact the statements of the jurors themselves, but rather was the Von Villas's defense team's recollection of what they said.

Thus there is no question that because of these multiple errors, there is a distinct possibility, if not a probability, that serious juror misconduct occurred. Of interest, however, is the fact that the trial judge never once was afforded the opportunity to test the credibility of Ms. Cornick and Ms. Brown. As counsel for Von Villas indicated, Ms. Cornick denied telling Mr. Boykoff any of the things contained in the unsigned declaration. The concern, then, is whether Von Villas's judgment of conviction should be reversed in toto on this record, or whether the judgment should be vacated and the matter remanded to the trial judge with instructions to allow examination of the jurors themselves as to what really occurred during deliberations that might have constituted juror misconduct.

 Impeachment of jury verdicts should not be allowed absent a careful examination by the trial court of the quality of the extrajudicial material followed by a judgment as to whether it was inherently likely to have influenced the juror. (*People* v. *Marshall, supra*, 50 Cal.3d 907, 951.) Justice Mosk reflected his concern in this difficult area in his concurring opinion in *Ballard* v. *Uribe* (1986) 41 Cal.3d 564 at page 575 [224 Cal.Rptr. 664, 715 P.2d 624]:

"I must express my apprehension at an incipient trend, that of losing parties attempting to impeach jury verdicts. We see this in numerous appeals and petitions for review based on juror affidavits. Giving such appeals and petitions any credence prevents the finality of judgments, places additional burdens on the judicial process, and contributes to disenchantment with the tort system. . . .

"In most cases it is not difficult for counsel to persuade a juror to sign a law-office-prepared affidavit. . . ."

 We are convinced that the trial judge must be allowed the opportunity to at least test the credibility of Jurors Cornick and Brown. If the trial judge is convinced that what they allegedly told the Von Villas defense team actually occurred, especially the information contained in Juror Cornick's unsigned declaration, and that Von Villas was prejudiced thereby, then a new trial must be afforded Von Villas.

In *People* v. *Perez* (1992) 4 Cal.App.4th 893 [6 Cal.Rptr.2d 141], defense counsel, after the defendant's conviction by jury of assault, requested permission to conduct a postverdict investigation of juror misconduct under

circumstances which indicated that jurors may have discussed the defendant's failure to take the stand at trial during their deliberations. The trial court was found to have committed error by denying the defense request for funds to conduct the investigation of juror misconduct. The trial court committed additional error when it assumed " 'for the sake of argument that all 12 jurors would say that that discussion [regarding appellant's failure to testify at trial] took place.' " (*Id.* at p. 906.) Defense counsel, upon hearing that statement, orally moved for a new trial. The trial court denied the motion.

Justice Weiner opined:

"Given the court's scenario that 12 jurors effectively agreed to disregard the court's express instructions, the jury declarations would have been admissible and constituted clear evidence of misconduct. While the court has broad discretion to rule on a new trial motion, that discretion was abused here, where the court denied the motion on a factual scenario presumptively establishing prejudicial jury misconduct.

"Our conclusion the court prejudicially erred in denying the new trial motion requires that we vacate the judgment and remand for further proceedings. On remand we wish to emphasize the trial court should not assume 12 jurors actually discussed Perez's failure to testify. Although we appreciate a substantial period of time has expired since the jury in this case was discharged and obtaining declarations from some or all of the jurors may be difficult or impossible, we do not believe the court's earlier error relieving defense counsel of this burden should result in any other procedure than that required by law." (4 Cal.App.4th at pp. 908, 909.)

Admittedly the events which occurred during the hearing on the motion for new trial in the instant case are quite different from those which took place during the *Perez* hearing. Nonetheless, we are concerned that ordering the reversal of Von Villas's conviction on the record before us would not serve the interest of justice. Indeed, to allow impeachment of a jury verdict based upon the admission of an unsigned juror's declaration, later rejected as untrue by that juror, and the testimony of a defense investigator as to statements made to him by another juror which indicate that juror misconduct had occurred, would, in our view, set a dangerous precedent.

By this we do not mean to opine that juror misconduct requiring a new trial for Von Villas did not occur. We merely require that the matter be remanded so that the trial judge will have the opportunity to test the credibility of the jurors in question and make a determination thereafter as to

whether misconduct occurred. If misconduct occurred, the prosecution must be given the opportunity to rebut the presumption of prejudice.

In that regard, the trial judge must conduct a full and fair hearing on the juror misconduct allegations. This will require that the trial judge ensure that the jurors in question be given every opportunity to testify, and, if they persist in asserting their privilege against self-incrimination, that they be "immunized" either through a grant of transactional immunity upon the request of the prosecution pursuant to section 1324, or a grant of "use immunity" through the court. (*Daly* v. *Superior Court* (1977) 19 Cal.3d 132, 146 [137 Cal.Rptr. 14, 560 P.2d 1193]; *Tarantino* v. *Superior Court* (1975) 48 Cal.App.3d 465, 469 [122 Cal.Rptr. 61].)

If, after the hearing, the trial judge concludes that juror misconduct actually occurred, and Von Villas was prejudiced thereby, he must be afforded a new trial.

As to the dissent, one might conclude from its shrill tone that our decision to vacate and remand as to Von Villas was a miscarriage of justice; a decision akin to an appellate court blindly affirming a conviction on a record reflecting patent reversible error. Such is not the case.

We are of the view that the trial judge's comments reflecting her belief that misconduct occurred did not constitute a finding of fact in that regard, and that her statement that she had ". . . insufficient evidence to find that there was absolute juror misconduct that would prejudice the defendant" reasonably reflects her concern about the probative value of the stipulated evidence. That is a reasonable inference which the dissent refuses to accept.

With that thought in mind, one wonders why the dissent is couched in such aggressive terms. The stipulated evidence found its source in the Von Villas defense team, a source which all would agree was, understandably, biased in favor of Von Villas.

The unexecuted and later refuted declaration of Ms. Cornick, which was never admitted as her statement, but rather as the defense team's recollection of what she said before she rejected the statement as untrue, was the most compelling evidence in support of the juror misconduct argument. Is that evidence, even considered with Mr. Boykoff's testimony reflecting his recollection of his conversation with Ms. Brown, so compelling that outright reversal of Von Villas's conviction should be ordered?

Should not the trial judge at least be given the opportunity to consider whether or not the jurors' statements constitute declarations against interest,

a theory which, if found applicable, would place the statements in an evidentiary category totally different from the category supporting their admissibility at the hearing on the motion for new trial—as statements of the jurors themselves as opposed to statements of members of Von Villas's defense team?

Finally, it is difficult to comprehend the dissent's claim that our decision to vacate and remand somehow violates well-established principles of stare decisis and appellate review. The admission of evidence by stipulation has been a recognized and oft used procedure for decades. We in no way criticize or refute that theory of proof. Evidence admitted by stipulation may, however, be more or less probative than evidence admitted through other procedures, whether it be live testimony or any other form of evidence. The claim that we have fundamentally distorted the appellate court function by vacating and remanding with instructions is totally unfounded and is deserving of no additional comment

## IV

### CONCLUSION

The judgment is affirmed as to appellant Ford. The judgment is vacated as to defendant Von Villas, and remanded for further proceedings consistent with this opinion.

Johnson, Acting P. J., concurred.

**WOODS (Fred), J.,** Concurring and Dissenting.—I concur in the affirmance of the Ford judgment and dissent from the majority opinion's disposition as to Von Villas.

I dissent from that disposition because it leaves intact convictions obtained by a trial of "undermine[d] integrity [and] taint[ed] [by] fundamental unfairness. . . ." (*People* v. *Marshall* (1990) 50 Cal.3d 907, 951 [269 Cal.Rptr. 269, 790 P.2d 676].)

Instead of forthrightly reversing the Von Villas judgment and ordering a new *trial*, as the law requires, the majority shrinks from its duty and without authority or coherent explanation simply invokes the deus ex machina of ordering a new trial *hearing*. Conceding that Von Villas proved *once* that his

trial was unfair, the majority opinion now—three years later—requires him to prove it again.

How does the majority opinion reach this result? Only by fundamentally distorting appellate court function, by ignoring binding appellate authority, and by creating out of whole cloth a new rule irreconcilable with stare decisis. I explain.

*The majority opinion concedes Von Villas proved juror misconduct.*

The majority opinion concedes the parties agreed to a stipulation which the trial court accepted. (Maj. opn., *ante*, pp. 252, 257.) By that stipulation Von Villas's investigator, Mr. Boykoff, was deemed to have testified Juror Cornick told him that, during the Von Villas deliberations, the jury discussed the Ford jury's conviction of Ford for murder. (Maj. opn., *ante*, pp. 251-252, fn. 15.) They then convicted Von Villas of murder.

This evidence, admitted without objection and by stipulation, was properly received. The majority opinion—despite some hand wringing—does not claim otherwise.

Further, the trial court weighed and evaluated this testimony and determined it to be truthful. That is, the trial court determined *both* that Juror Cornick had made the statements to investigator Boykoff *and* that the statements were true. The trial court stated. "Well, it narrows down to the issue of *did . . . the knowledge of the jurors of Ford's conviction* influence the jury improperly and has it prejudiced the defendant." (Italics added.) The majority opinion concedes as much. (Maj. opn., *ante*, p. 257.)

The majority opinion also concedes, as it must, that this obtaining of evidence "from sources other than in court is misconduct . . ." (Maj. opn., *ante*, p. 255.)

Thus, the majority opinion concedes Von Villas presented evidence of jury misconduct, that evidence was properly received, and the trial court determined it to be truthful.

*The majority opinion concedes the juror misconduct was prejudicial.*

The majority opinion concedes, juror misconduct having been proved, prejudice is presumed. (Maj. opn., *ante*, p. 255.) Further, as the majority

opinion states: "The prosecutor . . . produced no evidence to either disprove the allegation of jury misconduct or to prove that if there was misconduct it caused no prejudice to Von Villas." (Maj. opn., *ante*, p. 253.)

That the misconduct was prejudicial is beyond dispute. Apart from juror bribery or comparable felony conduct, one can hardly imagine misconduct more prejudicial than one jury discovering another jury has just convicted the accomplice of its defendant.

*The majority opinion concedes that prejudicial jury misconduct requires a new trial.*

Our Supreme Court has held that if a defendant proves prejudicial juror misconduct "the state must then rebut the presumption *or lose the verdict.*" (*People* v. *Marshall, supra,* 50 Cal.3d 907, 949 [italics added]; see also *People* v. *Andrews* (1983) 149 Cal.App.3d 358, 366 [196 Cal.Rptr. 796, 46 A.L.R.4th 1.) The majority opinion concedes the rule. (Maj. opn., *ante*, p. 255 [If the prosecution does not rebut the presumption of prejudice "the defendant is entitled to a new trial."] Italics added.)

*Creating out of whole cloth a new rule irreconcilable with stare decisis.*

The majority opinion avoids the conclusion its concessions require—the ordering of a new *trial*—by creating out of whole cloth a new rule irreconcilable with stare decisis. The new rule apparently is that *only live testimony counts.* Otherwise there will be "an untenable situation for the trial judge." (Maj. opn., *ante*, p. 257.) "We are convinced," the majority opinion states, "that the trial judge must be allowed the opportunity to at least test the credibility of Juror [] Cornick . . ." (Maj. opn., *ante*, p. 258.)

No authority is cited for this new rule. *People* v. *Perez* (1992) 4 Cal.App.4th 893 [6 Cal.Rptr.2d 141], for some unexplained reason discussed by the majority opinion, is—in the words of the majority opinion—"quite different" from the instant case. (Maj. opn., *ante*, p. 259.)

That this rule abrogates Evidence Code section 140 (" 'Evidence' means testimony, writings, material objects, *or other things presented to the senses that are offered to prove the existence or nonexistence of a fact.*" Italics added.) is not considered by the majority opinion.

That this rule is irreconcilable with stare decisis is also not considered by the majority opinion. (See *In re Mosley* (1970) 1 Cal.3d 913 [83 Cal.Rptr.

809, 464 P.2d 473] [the entire trial consisted of stipulated to testimony, viz., the preliminary hearing transcript]; *People* v. *Hobbs* (1970) 10 Cal.App.3d 831 [89 Cal.Rptr. 123]; *People* v. *Moreland* (1971) 15 Cal.App.3d 269 [92 Cal.Rptr. 563]; *People* v. *West* (1971) 15 Cal.App.3d 1015 [93 Cal.Rptr. 496]; *People* v. *Neder* (1971) 16 Cal.App.3d 846 [94 Cal.Rptr. 364]; *People* v. *Johnson* (1971) 18 Cal.App.3d 959 [96 Cal.Rptr. 421]; *People* v. *Cook* (1971) 19 Cal.App.3d 405 [96 Cal.Rptr. 860]; *People* v. *Guerra* (1971) 21 Cal.App.3d 534 [98 Cal.Rptr. 627]; *People* v. *Soranno* (1971) 22 Cal.App.3d 312 [99 Cal.Rptr. 235]; *People* v. *Sanchez* (1972) 24 Cal.App.3d 664 [101 Cal.Rptr. 193]; *People* v. *Dorsey* (1972) 25 Cal.App.3d 366 [101 Cal.Rptr. 826]; *People* v. *Howell* (1973) 30 Cal.App.3d 228 [105 Cal.Rptr. 748]; *People* v. *Phillips* (1973) 31 Cal.App.3d 483 [107 Cal.Rptr. 386] [all trials by stipulation, just *some* of the more than 10,000 such trials in Los Angeles County during 1970. (Greenwood et al., Prosecution of Adult Felony Defendants (1976) pp. xxiii, 125)]; *People* v. *Hall* (1979) 95 Cal.App.3d 299, 314-316 [157 Cal.Rptr. 107] [trial evidence included the stipulated evidence of a witness]; *People* v. *Phillips* (1985) 172 Cal.App.3d 670 [218 Cal.Rptr. 524] [stipulated to preliminary hearing transcript plus live testimony]; *People* v. *Townsend* (1971) 20 Cal.App.3d 919 [98 Cal.Rptr. 8] [stipulation to doctors' reports at a mentally disordered sex offender hearing]; *People* v. *Wells* (1983) 149 Cal.App.3d 497 [195 Cal.Rptr. 608] [stipulation to preliminary hearing transcript *and* police reports]; *In re Michael V.* (1986) 178 Cal.App.3d 159 [223 Cal.Rptr. 503] [entire trial consisted of a stipulation to police reports ]; *In re Steven H.* (1982) 130 Cal.App.3d 449 [181 Cal.Rptr. 719] [trial consisted of stipulated suppression hearing testimony]; *People* v. *Drieslein* (1985) 170 Cal.App.3d 591 [216 Cal.Rptr. 244] [trial consisted of a "live" witness and stipulations to the preliminary hearing and suppression hearing transcripts]; *People* v. *Imler* (1992) 9 Cal.App.4th 1178 [11 Cal.Rptr.2d 915] [by stipulation, trial consisted of a police report, tape recording, a memorandum, trial briefs, and testimony of one witness.])

*Fundamentally distorting appellate court function.*

When an appellate court attempts to tell parties how to try a case, how evidence is to be offered, what witnesses *must* be called, what stipulations cannot be agreed to—it ceases to be an appellate court. Our function is to *review* hearings and trials, not orchestrate them. The majority opinion violates this fundamental precept.

*Conclusion.*

The majority opinion is fundamentally flawed. Reading it, one has the impression that its author knows reversal is *required* but just can't bring

himself to say so. So, like a father, refereeing his defeated son's tennis match, the majority opinion requires that the last point be replayed.

Such a disposition may be called many things. Justice is not one of them.

Petitions for a rehearing were denied December 3, 1992, and December 10, 1992. Woods, J., was of the opinion that the petition filed December 10, 1992, should be granted. Appellants' petition for review by the Supreme Court was denied February 11, 1993. George, J., did not participate therein. Baxter, J., was of the opinion that the petition should be granted.